Weil, Gotshal & Manges LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Stephen Karotkin (SK 7357)
Lori R. Fife (LF 2839)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                        :
In re                                   :      Chapter 11 Case Nos.
                                        :
LORAL SPACE                             :      LEAD CASE 03-41710 (RDD)
 & COMMUNICATIONS LTD., et al.,         :      03-41709 (RDD) through
                                        :       03-41728 (RDD)
                Debtors.                :      (Jointly Administered)
                                        :
-------------------------------------------------------x
```

## NOTICE OF HEARING OF DEBTORS' MOTION PURSUANT
## TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY
## CODE FOR APPROVAL OF EMPLOYEE RETENTION PROGRAM

PLEASE TAKE NOTICE that a hearing on the annexed Motion, dated

November 3, 2003, of Loral Space & Communications Ltd. ("Loral Ltd.") and its

affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"),

Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Approval of

Employee Retention Program, will be held before the Honorable Robert D. Drain, United

States Bankruptcy Judge, in Room 610 of the United States Bankruptcy Court for the

Southern District of New York (the "Bankruptcy Court"), Alexander Hamilton House,

One Bowling Green, New York, New York, on November 26, 2003 at 10:00 a.m.

prevailing Eastern Time (the "Hearing").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-182 (General Order M-182 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.ucourts.gov, the official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with General Order M-182, upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq. and Lori R. Fife, Esq.), the attorneys for the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st floor, New York, New York 10004 (Attn: Lauren Landsbaum, Esq.), (iii) Shearman and Sterling, 599 Lexington Avenue, New York, New York 10022 (Attn: James L. Garrity, Jr., Esq.), attorneys for the Joint Provisional Liquidators appointed by the Supreme Court of Bermuda in respect of certain of the Debtors herein, (iv) Davis Polk and Wardwell, 450 Lexington Avenue, New York, New York 10017, (Attn: Marshall S. Huebner, Esq. and John Fouhey, Esq.), counsel to the agent for the Debtors' prepetition secured lenders, (v) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178 (Attn: Richard Toder, Esq.), the attorneys for certain lenders of Loral SpaceCom Corporation, (vi) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022 (Attn: David H. Botter, Esq.), the attorneys for the statutory

committee of unsecured creditors appointed in these chapter 11 cases, and (vii) those

parties entitled to notice pursuant to this Court's Order dated July 15, 2003 establishing

notice procedures in these chapter 11 cases, so as to be received no later than November

24, 2003 at 4:00 p.m. (prevailing Eastern Time).

Dated: November 3, 2003
      New York, New York

 

/s/ Lori R. Fife
Stephen Karotkin (SK 7357)
Lori R. Fife (LF 2839)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Weil, Gotshal & Manges LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Stephen Karotkin (SK 7357)
Lori R. Fife (LF 2839)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                            :
In re                                       :    Chapter 11 Case Nos.
                                            :
LORAL SPACE                                 :    LEAD CASE 03-41710 (RDD)
  & COMMUNICATIONS LTD., et al.,            :    03-41709 (RDD) through
                                            :     03-41728 (RDD)
                  Debtors.                  :    (Jointly Administered)
                                            :
-------------------------------------------------------x
```

## DEBTORS' MOTION PURSUANT TO
## SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE
## FOR APPROVAL OF EMPLOYEE RETENTION PROGRAM

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Loral Space & Communications Ltd. ("Loral Ltd.") and its affiliated

debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession

(collectively, the "Debtors" and, together with their non-debtor subsidiaries, "Loral"),

respectfully represent:

### Background

1.    On July 15, 2003 (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 24, 2003, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee").

2.     The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Loral's Businesses

3.     Loral is one of the world's leading satellite communications companies.  Loral's satellite products and services place it in the forefront of the satellite industry in terms of technological innovation and reliability.  Loral operates primarily two businesses, a fixed satellite services ("FSS") business, managed and operated through its Loral Skynet division ("Loral Skynet"), and a satellite design and manufacturing business, managed and operated by its Space Systems/Loral, Inc. ("SS/L") subsidiary.

4.     Loral's FSS business operates a fleet of seven satellites that operate at approximately 22,000 miles above the equator in orbital positions that remain fixed with respect to a given point on earth (i.e. geosynchronous or geostationary).  Loral's customers, such as major television and cable networks, use Loral's satellites to distribute television programming and to broadcast breaking news and sporting events.  Loral's FSS business is also utilized by communication service providers, resellers, corporations and government entities for broadband data transmission, Internet services,

private voice and data networks and other communication services throughout the world. To control its own satellites, as well as those of third parties, Loral Skynet also provides satellite telemetry, tracking and control services. As the fifth largest satellite fleet in the world, FSS's satellite broadcast services are utilized by the world's leading television networks and corporations.

5. Loral's SS/L business is one of the world's largest manufacturers of advanced commercial satellites and related satellite systems and it is the second largest supplier of commercial satellites worldwide. SS/L designs and manufactures high-powered direct-to-home broadcast satellites, commercial weather satellites, digital audio radio satellites and satellites for data networking applications. Since 1957, SS/L has been awarded contracts to build more than 220 satellites and has amassed more than 1,000 years of cumulative on-orbit service – including more than 330 years over and above the contracted life of the satellites.

6. In furtherance of these chapter 11 cases, on July 15, 2003, Loral Ltd. and Loral Licensing Ltd. (collectively, the "Bermuda Group"), which are incorporated in Bermuda, commenced coordinated proceedings in the Supreme Court of Bermuda. The Supreme Court of Bermuda issued an order appointing certain principals of KPMG International as Joint Provisional Liquidators (the "JPLs"). The Supreme Court of Bermuda has also empowered and directed the JPLs to oversee the continuation of the Bermuda Group under the control of their Board of Directors and under the supervision of the Supreme Court of Bermuda and this Court in effecting a plan of reorganization under the Bankruptcy Code.

7.     As of March 31, 2003, the consolidated financial statements of Loral reflected assets totaling approximately $2.7 billion and liabilities totaling approximately $3 billion.  As of March 31, 2003, Loral had approximately 2,400 full-time employees, of whom approximately 3% are subject to collective bargaining agreements.

## Jurisdiction

8.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § § 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409.

## Relief Requested

9.     By this Motion, the Debtors request approval of an employee retention program (the "Employee Retention Program") comprised of (i) a retention plan (the "Retention Plan"), (ii) additional severance arrangements (the "Severance Arrangements") and (iii) "change in control" severance agreements with two key employees (the "Change in Control Agreements").  The Employee Retention Program has been designed to retain senior level employees, managers and other technical personnel ("Key Employees") who provide essential management and other necessary services during the Debtors' chapter 11 cases.

## Need for the Employee Retention Program

10.     Loral's Key Employees are an extremely valuable asset.  They possess unique knowledge, skills, experience and customer and supplier relationships which are vital to the business enterprise and, in many cases, impossible to replicate.  It is self-evident that the continued employment, dedication, motivation and loyalty of the

Key Employees are not only essential to the maintenance, preservation and prosperity of Loral, but also to the success of the entire reorganization effort.

11.     Unfortunately, however, the ability of Loral to successfully retain and rely on the continued services of the Key Employees has been thrown into turmoil by recent events – the state of the satellite industry, the precarious financial condition of Loral and the commencement of the chapter 11 cases.  These events have caused a considerable amount of uncertainty, instability and anxiety among the Key Employees for several reasons, including:

- the general lack of certainty in working for a chapter 11 debtor, particularly when there is an alternative market for talented and experienced management personnel;

- the business constraints imposed as a consequence of the chapter 11 cases;

- the lack of the ability to receive effective equity-based incentive compensation with the significant growth potential attendant thereto; and

- the general concern about employment security arising from fears of downsizing, asset sales or a change in control which often occur in chapter 11 cases.

This instability has intensified because Loral's competitors are attempting to capitalize on its current position, and corporate headhunters are targeting Loral's Key Employees.

12.     Indeed, largely as a consequence of these factors, since 2002 the Debtors have incurred a loss of approximately 1000 employees, which number includes reductions in force due to diminished business, with the concomitant adverse impact on operations, employee morale and the general well-being of the business.  SS/L, specifically, has lost a third of its workforce in the past year, from approximately 2300

employees to approximately 1500 employees. In the current calendar year, Debtors have lost approximately 124 employees due to voluntary resignation. It is apparent that there is a serious problem that must be promptly addressed, and Loral is deeply concerned that recent departures of Key Employees will lead to additional departures of their colleagues.

13.     In addition to the severely detrimental impact on operations, the loss of Key Employees also would have additional adverse economic effects for Loral. Loral has expended significant time and resources in recruiting and training many of the Key Employees. For example, at SS/L, more than 50% of the employees have been with SS/L for more than 15 years. This investment essentially would be entirely lost if they were to depart. Moreover, the ability to attract competent new employees to fill vacated positions is both difficult and extremely costly. Not only are qualified candidates scarce, but they too will be reluctant to join a chapter 11 debtor for many of the same reasons outlined above.

14.     There can be no question that the need to implement the Employee Retention Program is acute. It represents not only a sound exercise of Loral's business judgment after careful study, but a necessary and cost-effective measure to preserve, enhance and maximize value and to assure a successful reorganization.

### The Employee Retention Program

15.     The Debtors' senior management developed the Employee Retention Program with the assistance of Greenhill & Co. LLC. The Compensation Committee of the Board of Directors of Loral Ltd. (the "Compensation Committee") has adopted the Employee Retention Program, subject to this Court's approval. In

determining whether to adopt the Employee Retention Program, the Compensation Committee considered, among other things, the following factors:

(a)     The obvious need to retain Key Employees for numerous reasons, including institutional knowledge, market competition and cost of replacement of such human resources;

(b)     The costs associated with the implementation of the program and the costs of similar programs implemented in other reorganization cases;

(c)     The role of each covered employee in the Debtors' enterprise and the chapter 11 cases, as well as the effect of the chapter 11 cases on such employee's duties and responsibilities;

(d)     The operational and financial performance of the Debtors, including the impact of the Employee Retention Program on those employees who are not covered by such program;

(e)     Compensation received by personnel at other companies in comparison to what has actually been received by Key Employees during the period prior to the Commencement Date; and

(f)     The disruption and costs associated with losing and having to replace key employees, as well as the availability of suitable replacements.

16.     The Debtors believe prompt approval of the Employee Retention Program is imperative and represents a sound investment that will reap substantial benefits and returns. The Employee Retention Program is designed to meet the unique needs of Debtors' business segments by differentiating whether and to what extent the Key Employees in the corporate office (the "Corporate Office"), the Loral Skynet division, and the SS/L subsidiary will participate. The programs have been tailored to the specific needs of each business segment.

A.    The Retention Plan

17.    The Retention Plan provides for retention payments in amounts and on the dates set forth below according to the business unit at which the key employee is employed.

## Corporate Office

- 14 employees at the Corporate Office will be eligible for retention payments.[1] The retention amount for ten employees is 50% of salary and for four employees is 40% of salary.
- The retention payments are in addition to any amounts awarded under Loral's annual bonus plan, i.e. the Management Incentive Plan.

## Loral Skynet

Employees at Loral Skynet will be eligible to receive their target annual bonus award under the Management Incentive Plan, as determined at the discretion of Loral. A small group of 13 employees at Loral Skynet will be eligible for additional retention payments, with such employees classified into one of three groups for determining the amount of the retention payments.

- Group 1 at Loral Skynet includes two employees. The retention amount for each such employee in this group is equal to 20% of the individual's base salary.

- Group 2 at Loral Skynet includes five employees. The retention amount for each such employee in this group is equal to 30% of the individual's base salary.

- Group 3 at Loral Skynet includes six employees (i.e., management and Loral Skynet's President). The retention amount for each such

---

[1] The Debtors' Chief Executive Officer ("CEO"), who is currently receiving his supplemental retirement plan benefits (the "SERP Benefits") as his base salary and bonus, is not designated as a participant in the Employee Retention Program, but the Compensation Committee reserves its right to include him if his SERP benefits are discontinued or limited.

employee in this group is equal to 50% of the individual's base salary.

### SS/L

A total of 469 employees at SS/L will be eligible for retention payments. These payments are in lieu of annual bonuses under the Management Incentive Plan[2] during the operation of the Retention Plan.

- The retention amount for each such employee is equal to the greater of the employee's 2002 Management Incentive Bonus or 15% of the individual's base salary.

- Pursuant to the above formula, retention payments for some of the employees will be equal to only their Management Incentive Bonus for the prior year. Such amount may be inadequate to retain them. Accordingly, an additional amount of $2.0 million is being reserved to address the need for additional retention payments on a case-by-case basis. No employee may receive a combined retention payment and discretionary payment greater than 50% of such individual's base salary.

18. Retention payments will be made on the following dates, provided the Key Employee remains employed by the Debtors on such target date:

### Corporate Office

- For the top 3 executives[3] at the Corporate Office, 100% paid upon a Triggering Event (as defined below) for each of Loral SpaceCom Corporation ("SpaceCom"), Loral Orion, Inc. ("Orion") and SS/L. In the event such a Triggering Event does not occur by September 1, 2004, then 25% of the total retention

---

[2] The Debtors plan to continue to honor their an annual incentive bonus plan for management employees (the "Management Incentive Bonus Plan"), which is a customary yearly incentive plan in which key employees and other employees are eligible to receive annual cash bonuses based upon performance (the "Management Incentive Bonus"). As noted above, however, employees at SS/L eligible for retention payments will receive such retention payments in lieu of a Management Incentive Bonus.

[3] The President, the Chief Financial Officer, and the General Counsel.

payment will be paid on such date and the remaining 75% of the total retention payment payable upon a Triggering Event for each of SpaceCom, Orion and SS/L.

- For other participants, 25% paid on December 1, 2003, 25% paid on March 31, 2004, and 50% paid upon a Triggering Event for each of SpaceCom, Orion and SS/L.

**Loral Skynet**

- For the top executive at Loral Skynet, 100% paid upon a Triggering Event for each of Orion and SpaceCom. In the event such a Triggering Event does not occur by September 1, 2004, then 25% of the total retention payment will be paid on such date and the remaining 75% of the total retention payment payable upon a Triggering Event for each of Orion and SpaceCom.

- For other participants, 25% paid on each of December 1, 2003, March 31, 2004, June 30, 2004, and 25% paid upon a Triggering Event for each of Orion and SpaceCom.

**SS/L**

- For the top executive at SS/L, 100% paid upon a Triggering Event for SS/L. In the event a Triggering Event for SS/L does not occur by September 1, 2004, then 25% of the total retention payment will be paid on such date and the remaining 75% of the total retention payment payable upon a Triggering Event for SS/L.

- For other participants, 25% paid on each of December 1, 2003, March 31, 2004, June 30, 2004, and 25% paid upon a Triggering Event for SS/L.

19.     A Triggering Event shall mean any of (i) the effective date of a plan of reorganization, (ii) a change of control, (iii) a liquidation, closure or shutdown, or (iv) a sale of all or substantially all of the assets (excluding the sale of assets to Intelsat approved by the Court on October 24, 2003).

20.     Notwithstanding the requirement that the employee remains employed by the Debtors on the specified dates, for an employee whose employment is

terminated as a result of death, disability or termination without cause or who resigns for good reason, if applicable, a pro rata amount of the full retention payment will be made. The pro rata amount will be calculated based on such employee's actual service from September 1, 2003 through the applicable Triggering Event. The pro rata amount will be paid at the same time as payment is made to other similarly situated Key Employees.

21. The maximum aggregate amount of retention payments under the Retention Plan will be $2.5 million with regard to the Corporate Office, $1.0 million with regard to Loral Skynet and $12.0 million with regard to SS/L, plus a discretionary pool of up to $2.0 million for SS/L. However, the retention payments at SS/L replaces $5.0 million that ordinarily would be budgeted for bonus payments under the Management Incentive Plan.

**B.**     **The Severance Arrangements**[4]

    22.     The proposed Severance Arrangements provide additional severance benefits above the Debtors' existing severance policies for certain Key Employees at the Corporate Office and SSL only.[5] For severance purposes, the Debtors classified employees in groups. An employee who is involuntarily terminated without cause (as determined by Loral in accordance with its plans) will be eligible to receive severance in an amount set forth below based on such employee's group (with such severance amounts being inclusive of any severance under Debtors' existing severance policies).

### Corporate Office

- Group 1 at Corporate Office consists of 10 employees. The severance benefit for each such employee in this group is equal to 200% of the individual's annual base salary. Except with respect to the top 3 executive officers[6] at the Corporate Office, severance is subject to mitigation for the amount of severance over 100% of the individual's annual base salary. Any such mitigation will be based on a dollar for dollar reduction for any salary received from a new employer during the severance period. Severance amounts subject to mitigation are payable periodically. Payments that are not subject to mitigation are payable in one lump-sum.

---

[4] The Debtors continue to honor their prepetition severance policies. The severance policies covering Loral Skynet and SS/L generally provide employees, upon involuntary termination of employment, with one week of severance pay for every one year of service, with slight enhancements to employees with more than twenty-six years of service with the Debtors. The provision of benefits under the Debtors' welfare plans is continued for the length of the severance period. Severance at the Corporate Office is discretionary.

[5] The Debtors believe that the current severance policy for Loral Skynet is adequately protective and thus Debtors are not seeking an addition to these severance benefits.

[6] The President, the Chief Financial Officer, and the General Counsel.

- Group 2 at Corporate Office consists of 23 employees. The severance benefit for each such employee in this group is equal to 100% of the individual's base salary.

- Group 3 at Corporate Office consists of six employees. The severance benefit for each such employee in this group is equal to 50% of the individual's base salary.

- The additional cost that could be incurred as a result of the proposed changes to the existing severance policies will not exceed $4.7 million (exclusive of severance under existing policies) based on current salaries.

- Employees in each Group will receive continued medical coverage during the severance period and outplacement assistance.

**SS/L**

- Group 1 at SS/L consists of 13 employees. The severance benefit for each such employee in this group is equal to 100% of the individual's base salary.

- Group 2 at SS/L consists of 37 employees. The severance benefit for each such employee in this group is equal to 75% of the individual's base salary.

- Group 3 at SS/L consists of 119 employees. The severance benefit for each such employee in this group is equal to 50% of the individual's base salary.

- Group 4 at SS/L consists of 300 employees. The severance benefit for each such employee in this group is equal to 33% of the individual's base salary.

- Severance amounts in excess of the greater of (i) 50% of an individual's base salary or (ii) the amount payable under SS/L's standard severance policy are subject to mitigation. Any such mitigation will be based on a dollar for dollar reduction for any salary or similar cash compensation received from a new employer during the severance period.

- All other severed employees would be paid amounts due under the existing severance policies.

- The additional cost that could be incurred as a result of the proposed changes to the existing severance policies will not exceed $17.3 million (exclusive of severance under existing policies) based on current salaries.

23. The costs described above are meant only to illustrate the absolute aggregate maximum liability that could hypothetically be incurred as a result of the proposed changes to existing severance policies. The Debtors expect that the actual costs will be significantly less than the amounts indicated as the Debtors are continuing to operate their business and as a result of voluntary resignations.

### C. Change in Control Severance Agreements

24.     The Debtors' desire to provide additional severance protection through change in control severance agreement (the "Change in Control Agreements") to C. Patrick DeWitt and Ronald Haley (each, an "Executive").  The Change in Control Agreements provide each Executive with additional protection by permitting each of them to resign if they have "good reason" (as described below) and to be reimbursed for additional taxes, if any, by reason of Section 4999 of the Internal Revenue Code.  The amount of severance payments under the Change in Control Agreements, however, is the same amount as provided under the severance proposed under the general program for the Key Employees and is in lieu of and not in addition to severance under the general program.

25.     The Change in Control Agreements, which have a two year term, provide that severance benefits are payable if the Executive is involuntarily terminated without cause or terminates employment for "good reason" within one year following a change in control.

26.     Good reason to terminate employment exists with respect to the Executive if there is (i) any diminution of, or assignment by SS/L or Loral Ltd., as applicable (as applicable, "Company") of duties inconsistent with Executive's position, duties, responsibilities and status with the Company immediately prior to a Change in Control (as defined below), or a change in Executive's titles or positions as in effect immediately prior to a Change in Control, or any removal of Executive from, or any failure to reelect Executive to, any of such titles or positions, except in connection with Executive's termination of employment for disability, voluntary termination or Cause or

as a result of Executive's death, or by Executive other than for "good reason", (ii) a reduction by the Company or SS/L in Executive's base salary as in effect on the date hereof or as the same may be increased from time to time, or the Company or SS/L's failure to increase Executive's base salary (within twelve (12) months of Executive's last increase in base salary prior to a Change in Control or any anniversary of the date of such increase) after a Change in Control in an amount which at least equals, on a percentage basis, the average percentage increase in base salary for all officers of the Company or SS/L (excluding Executive) effected in the preceding 12 months; (iii) any failure to continue any employee benefit, incentive or securities plan or arrangement, or the taking of action that adversely affects the Executive's participation in or reduces benefits under such plans or arrangements unless a substantially comparable plan or arrangement is provided; (iv) the relocation of the primary workplace of the Executive by more than a reasonable commuting distance; (v) a substantial increase in business travel obligations over such obligations as they shall have existed at the time of a Change in Control; (vi) any failure to provide the number of paid vacation days to which the Executive was entitled at the time of the Change in Control; (vii) any material breach of the Change in Control Agreement; (viii) any failure to obtain the satisfactory agreement from any successor to assume and agree to perform the Change in Control Agreement; and (ix) any purported termination of employment without prior written notice specifying the reason for such termination.

27. For the purposes of the Change in Control Agreements, a "Change in Control" includes (i) any purchase of shares of the Company or SS/L's common stock or securities convertible into shares of common stock made pursuant to a tender or

exchange offer (other than any such tender offer or exchange made by the Company or SS/L); (ii) acquisition by any person (other than any employee benefit plan sponsored by the Company or its subsidiaries) of beneficial ownership of 20% or more of the total voting power of the Company or SS/L's then outstanding stock and securities, except as a result of a merger or consolidation in which the voting securities of the Company or SS/L immediately prior to such merger or consolidation represent at least 75% of the combined voting power of the stock of the Company, SS/L or the surviving company or any parent thereof outstanding immediately after such merger or consolidation; (iii) change in the composition of the Board of the Company or SS/L, so that existing Board members and their approved successors do not constitute a majority of such Board; (iv) consummation of a merger or consolidation of the Company of SS/L unless shareholders of voting securities immediately prior to the merger or consolidation continue to hold 75% or more of the voting securities of the resulting entity; and (v) shareholder approval of a liquidation or dissolution of the Company or SS/L or there is a sale of substantially all of the Company or SS/L's assets. The definition of Change in Control provides that the acquisition of stock of the Company or SS/L by any creditor of the Debtors as of the petition date or a change in the composition of the Board of Directors of the Company or SS/L, in each case pursuant to a plan of reorganization with respect to the Debtors shall not constitute a Change in Control.

28.     The Change in Control Agreements provide for a severance amount equal to "two times" base salary and two years continued medical, life and accidental death and dismemberment benefits. Severance payments are grossed-up to the extent necessary to cover any "golden parachute" excise taxes under Section 4999 of the

Internal Revenue Code such that the net amount retained by Executive after income taxes and excises taxes on the gross-up amount equals the severance amount. Further, legal fees in connection with a good faith dispute involving the agreement shall be paid or reimbursed by the Debtors.

29. The Change in Control Agreements are essential to the retention of the Executives and, more importantly, to the preservation and enhancement of the Debtors' business. The Change in Control Agreements will motivate these employees to remain in the employ of the Debtors and focus on the Debtors' operations and the success and prosperity of the business enterprise.

30. The maximum potential cost to the Debtors under the Change in Control Agreements is approximately $1.37 million.

### Approval of the Employee Retention Program and the Change in Control Agreements Is Authorized Under Sections 105(a) and 363(b) of the Bankruptcy Code

31. The Employee Retention Program and the Change in Control Agreements should be approved by the Court pursuant to section 363 of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." Further, pursuant to section 105(a) of the Bankruptcy Code, "the court may issue any order, process, or judgment that is necessary to carry out the provisions of this title."

32. It is generally recognized that the use, sale or lease of property of a debtor's estate, other than in the ordinary course of business, is appropriate when there is

a "sound business purpose" that justifies such action. *See, e.g.*, *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983). *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung (In re McClung)*, 789 F.2d 386, 390 (6th Cir. 1986); *Inst. Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith).

33.     In addition, under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern"); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("the Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

34.     Lastly, section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." The standard applied to

determine whether the assumption of an executory contract should be authorized is the "business judgment" standard. *See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39-40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re III Enterprises, Inc.,* 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet.").

35.     In the context of reorganization cases under chapter 11, the establishment of an employee retention and severance program for key employees has been approved by numerous courts in this and other districts. *See, e.g., In re R.H. Macy & Co.*, Case No. 92B 40477 (BRL) (Bankr. S.D.N.Y. 1992); *In re Best Products Co., Inc.,* Case No. 91B 10048 through 91B 10053 (TLB) (Bankr. S.D.N.Y. 1991); *In re Montgomery Ward Holding Corp.*, No. 97-1409 (Bankr. D. Del. Sept. 17, 1997) (approving approximately $100 million key Employee Retention Program; approving 24 months severance pay to executive committee members; 18 months severance pay to 26 vice presidents and 12 months severance pay to 119 high-level managers; approving $17.6 million of retention bonuses); *In re Long John Silver's Restaurants, Inc*., No. 98-1164 (Bankr. D. Del. Aug. 21, 1998) (approving lump sum severance payments equal to 100-200% of annual base salaries for 26 top management personnel). The courts have recognized that debtors need to implement specific programs designed to retain key personnel in order to ensure that the debtors' business operations are preserved, to assure that the value of their estates is optimized and to promote a successful reorganization.

36.     The implementation of the Employee Retention Program and the Change in Control Agreements in connection therewith clearly is for a sound business purpose, represents a reasonable exercise of the Debtors' business judgment and will serve in many ways to preserve, protect and enhance the assets and operations of the Debtors for the benefit of its estate, creditors and equity interest holders.

37.     The Debtors are currently facing a potential loss of Key Employees during a critical phase in the reorganization.  Over the past year, they have lost several Key Employees and these losses are continuing.  Action must be taken before the Debtors' businesses suffer additional and potential irreparable harm.

38.     The Key Employees are justifiably concerned.  Simply stated, these employees are central to the Debtors' operations and reorganization effort.  The continued loss of Key Employees and the dislocations associated therewith will have a negative effect on morale, lead to further attrition and result in the loss of skills, expertise and business relationships which are invaluable.  Moreover, even if suitable replacements could be found for these employees, the costs involved in attracting and training them will be formidable.  It is clear that the obvious benefits which will be realized from the implementation of the Employee Retention Program and the Change in Control Agreements completely justify the investment.

39.     The Debtors have determined, in the exercise of their business judgment, that the implementation of the Employee Retention Program and the Change in Control Agreements is critical to the preservation and enhancement of its business operations, which will inure to the benefit of all parties in interest and facilitate a

successful reorganization.  Accordingly, the Debtors request that the Employee Retention Program and the Change in Control Agreements be approved.

## Notice

40.     No trustee or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) the attorneys for the agent for the Debtors' prepetition secured lenders, (iii) the attorneys for the Creditors' Committee, (iv) the attorneys for certain lenders of Loral SpaceCom Corporation, and (v) those parties entitled to notice pursuant to this Court's Order, dated July 15, 2003, establishing notice procedures in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

41.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: November 3, 2003
New York, New York

/s/ Lori R. Fife
Stephen Karotkin (SK 7357)
Lori R. Fife (LF 2839)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
                                    :
In re                               :          Chapter 11 Case Nos.
                                    :
LORAL SPACE                         :          LEAD CASE 03-41710 (RDD)
  & COMMUNICATIONS LTD., et al.,    :          03-41709 (RDD) through
                                    :           03-41728 (RDD)
                Debtors.            :          (Jointly Administered)
                                    :
------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS
## 105(a) AND 363(b) OF THE BANKRUPTCY CODE
## APPROVING EMPLOYEE RETENTION PROGRAM

Upon the Motion, dated November 3, 2003 (the "Motion"), of Loral Space

& Communications Ltd. ("Loral") and its affiliated debtors, as debtors and debtors in

possession (collectively, with Loral, the "Debtors"), for approval of an employee

retention program (the "Employee Retention Program"), as more fully set forth in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. § § 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern

District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. § § 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the United

States Trustee for the Southern District of New York, (ii) the attorneys for the agents for

the Debtors' prepetition secured lenders, (iii) the attorneys for the statutory committee of

unsecured creditors appointed in these chapter 11 cases, (iv) the attorneys for certain

lenders of Loral SpaceCom Corporation, and (v) those parties entitled to notice pursuant to this Court's Order, dated July 15, 2003, establishing notice procedures in these chapter 11 cases and it appearing that no other or further notice need be provided; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Employee Retention Program is hereby approved and ratified in all respects; and it is further

ORDERED that the Debtors are hereby authorized to execute, deliver implement and fully perform any and all instruments and documents and to take any and all actions necessary or appropriate to implement and effectuate the Employee Retention Program, including, without limitation, making the payments thereunder; and it is further

ORDERED that nothing in the Motion shall be deemed a request by the Debtors for authority to assume, and nothing in this Order shall be deemed authorization or approval to assume, any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that the requirement pursuant to Rule 9013-1(b) of the Local

Bankruptcy Rules for the Southern District of New York that the Debtors file a

memorandum of law in support of the Motion is hereby waived.

Dated: November __, 2003
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE