# EXHIBIT 1

## LORAL SKYNET CORPORATION

Issuer

## 14% SENIOR SECURED CASH/PIK NOTES DUE 2015

### INDENTURE

Dated as of [ ], 2005

[          ]

Trustee

# CROSS-REFERENCE TABLE

| TIA Section | | Indenture Section |
|---|---|---|
| 310(a)(1) | .................................................... | 7.10 |
| (a)(2) | .................................................... | 7.10 |
| (a)(3) | .................................................... | N.A. |
| (a)(4) | .................................................... | N.A. |
| (a)(5) | .................................................... | 7.10 |
| (b) | .................................................... | 7.08; 7.10 |
| (c) | .................................................... | N.A. |
| 311(a) | .................................................... | 7.11 |
| (b) | .................................................... | 7.11 |
| (c) | .................................................... | N.A. |
| 312(a) | .................................................... | 2.05, 12.03 |
| (b) | .................................................... | 12.03 |
| (c) | .................................................... | 12.03 |
| 313(a) | .................................................... | 7.06 |
| (b)(1) | .................................................... | N.A. |
| (b)(2) | .................................................... | 7.06 |
| (c) | .................................................... | 12.02 |
| (d) | .................................................... | 7.06 |
| 314(a) | .................................................... | 4.02; 4.03 |
| (b) | .................................................... | N.A. |
| (c)(1) | .................................................... | 12.04 |
| (c)(2) | .................................................... | 12.04 |
| (c)(3) | .................................................... | N.A. |
| (d) | .................................................... | 11.03 |
| (e) | .................................................... | 12.05 |
| (f) | .................................................... | N.A. |
| 315(a) | .................................................... | 7.01 |
| (b) | .................................................... | 7.05; 12.02 |
| (c) | .................................................... | 7.01 |
| (d) | .................................................... | 7.01 |
| (e) | .................................................... | 6.11 |
| 316(a)(last sentence) | .................................................... | 12.06 |
| (a)(1)(A) | .................................................... | 6.05 |
| (a)(1)(B) | .................................................... | 6.04 |
| (a)(2) | .................................................... | Section 1 of the Note; 12.06 |
| (b) | .................................................... | Section 1 of the Note; 6.07 |
| (c) | .................................................... | 9.04 |
| 317(a)(1) | .................................................... | 6.08 |

| (a)(2) | ................................................................................................... | 6.09 |
| (b) | ................................................................................................... | 2.04 |
| 318(a) | ................................................................................................... | 12.01 |

N.A. means Not Applicable.
Note: This Cross-Reference Table shall not, for any purpose, be deemed to be part of this Indenture.

# TABLE OF CONTENTS

ARTICLE 1 Definitions and Incorporation by Reference .................................................1
    SECTION 1.01.    Certain Definitions.........................................................1
    SECTION 1.02.    Other Definitions. ..........................................................28
    SECTION 1.03.    Incorporation by Reference of Trust Indenture Act. .....................28
    SECTION 1.04.    Rules of Construction. ....................................................29

ARTICLE 2 The Notes .....................................................................................30
    SECTION 2.01.    Form and Dating. ..........................................................30
    SECTION 2.02.    Execution and Authentication. ........................................30
    SECTION 2.03.    Registrar and Paying Agent. ...........................................31
    SECTION 2.04.    Paying Agent To Hold Money in Trust. ...........................31
    SECTION 2.05.    Noteholder Lists............................................................31
    SECTION 2.06.    Transfer and Exchange...................................................32
    SECTION 2.07.    Replacement Notes. ......................................................32
    SECTION 2.08.    Outstanding Notes.........................................................32
    SECTION 2.09.    Temporary Notes. .........................................................33
    SECTION 2.10.    Cancellation. ...............................................................33
    SECTION 2.11.    Defaulted Interest.........................................................33
    SECTION 2.12.    CUSIP Numbers...........................................................33

ARTICLE 3 Redemption ..................................................................................33
    SECTION 3.01.    Notices to Trustee. .......................................................33
    SECTION 3.02.    Selection of Notes To Be Redeemed...............................34
    SECTION 3.03.    Notice of Redemption. ..................................................35
    SECTION 3.04.    Effect of Notice of Redemption. ....................................35
    SECTION 3.05.    Deposit of Redemption Price. ........................................35
    SECTION 3.06.    Notes Redeemed in Part.................................................36

ARTICLE 4 Covenants.....................................................................................36
    SECTION 4.01.    Payment of Notes..........................................................36
    SECTION 4.02.    [Intentionally Left Blank]. .............................................38
    SECTION 4.03.    Compliance Certificate. .................................................38
    SECTION 4.04.    Change of Control..........................................................38
    SECTION 4.05.    Limitation on Restricted Payments. .................................40
    SECTION 4.06.    Limitation on Indebtedness.............................................42
    SECTION 4.07.    Limitation on Liens.......................................................44
    SECTION 4.08.    Limitation on Restrictions on Distributions from Restricted
                          Subsidiaries....................................................................45
    SECTION 4.09.    Limitation on Sales of Assets and Subsidiary Stock.....................46
    SECTION 4.10.    Limitation on Affiliate Transactions. ...............................49
    SECTION 4.11.    Guarantors...................................................................50
    SECTION 4.12.    Limitation on the Issuance and Sale of Capital Stock of Restricted
                          Subsidiaries....................................................................51
    SECTION 4.13.    Limitation on Sale/Leaseback Transactions....................51
    SECTION 4.14.    Existence. ....................................................................51
    SECTION 4.15.    Payment of Taxes and Other Claims................................52

SECTION 4.16.    Insurance; Maintenance of Properties...........................................52
SECTION 4.17.    Notice of Defaults.........................................................................53
SECTION 4.18.    Business Activities. .......................................................................53
SECTION 4.19.    Use of Proceeds.............................................................................53
SECTION 4.20.    Further Instruments and Acts. .......................................................53

ARTICLE 5 Merger ..............................................................................................53
SECTION 5.01.    Merger and Consolidation..............................................................53

ARTICLE 6 Defaults and Remedies.......................................................................55
SECTION 6.01.    Events of Default. ..........................................................................55
SECTION 6.02.    Acceleration. .................................................................................56
SECTION 6.03.    Other Remedies..............................................................................57
SECTION 6.04.    Waiver of Past Defaults..................................................................57
SECTION 6.05.    Control by Majority........................................................................58
SECTION 6.06.    Limitation on Suits.........................................................................58
SECTION 6.07.    Rights of Holders to Receive Payment. ..........................................58
SECTION 6.08.    Collection Suit by Trustee...............................................................58
SECTION 6.09.    Trustee May File Proofs of Claim...................................................58
SECTION 6.10.    Priorities........................................................................................59
SECTION 6.11.    Undertaking for Costs. ...................................................................59
SECTION 6.12.    Waiver of Stay or Extension Laws..................................................59
SECTION 6.13.    Payment of Premium......................................................................60

ARTICLE 7 Trustee ..............................................................................................60
SECTION 7.01.    Duties of Trustee. ..........................................................................60
SECTION 7.02.    Rights of Trustee. ..........................................................................61
SECTION 7.03.    Individual Rights of Trustee. ..........................................................61
SECTION 7.04.    Trustee's Disclaimer.......................................................................62
SECTION 7.05.    Notice of Defaults..........................................................................62
SECTION 7.06.    Reports by Trustee to Holders.........................................................62
SECTION 7.07.    Compensation and Indemnity. ........................................................62
SECTION 7.08.    Replacement of Trustee...................................................................63
SECTION 7.09.    Successor Trustee by Merger. .........................................................64
SECTION 7.10.    Eligibility; Disqualification. ...........................................................64
SECTION 7.11.    Preferential Collection of Claims Against Company. ....................64

ARTICLE 8 Discharge of Indenture; Defeasance.....................................................64
SECTION 8.01.    Discharge of Liability on Notes; Defeasance. ................................64
SECTION 8.02.    Conditions to Defeasance. ..............................................................65
SECTION 8.03.    Application of Trust Money. ...........................................................66
SECTION 8.04.    Repayment to Company. .................................................................66
SECTION 8.05.    Indemnity for Government Obligations............................................66
SECTION 8.06.    Reinstatement.................................................................................67

ARTICLE 9 Amendments.......................................................................................67
SECTION 9.01.    Without Consent of Holders. ..........................................................67
SECTION 9.02.    With Consent of Holders.................................................................68
SECTION 9.03.    Compliance with Trust Indenture Act. ............................................69

SECTION 9.04.     Revocation and Effect of Consents and Waivers. ...........................69
SECTION 9.05.     Notation on or Exchange of Notes. ..................................................69
SECTION 9.06.     Trustee To Sign Amendments. ........................................................69

ARTICLE 10 Guaranties............................................................................................70
SECTION 10.01.    Guaranties. ....................................................................................70
SECTION 10.02.    Limitation on Liability. ..................................................................72
SECTION 10.03.    Successors and Assigns...................................................................72
SECTION 10.04.    No Waiver. .....................................................................................72
SECTION 10.05.    Modification....................................................................................72
SECTION 10.06.    Release of Guarantor......................................................................72

ARTICLE 11 Collateral .............................................................................................73
SECTION 11.01.    Collateral Documents; Additional Collateral...................................73
SECTION 11.02.    Recording, Registration and Opinions. ...........................................75
SECTION 11.03.    Release of Collateral. .....................................................................76
SECTION 11.04.    Possession and Use of Collateral. ...................................................77
SECTION 11.05.    Specified Releases of Collateral. ....................................................77
SECTION 11.06.    Disposition of Collateral Without Release.......................................78
SECTION 11.07.    Form and Sufficiency of Release.....................................................79
SECTION 11.08.    Purchaser Protected.........................................................................79
SECTION 11.09.    Authorization of Actions To Be Taken by the Collateral Agent
                    Under the Collateral Documents......................................................79
SECTION 11.10.    Authorization of Receipt of Funds by the Collateral Agent Under
                    the Collateral Documents................................................................80
SECTION 11.11.    Third Party Consents to Pledge of Collateral. .................................80

ARTICLE 12 Miscellaneous.......................................................................................80
SECTION 12.01.    Trust Indenture Act Controls...........................................................80
SECTION 12.02.    Notices. ..........................................................................................81
SECTION 12.03.    Communication by Holders with Other Holders. ............................82
SECTION 12.04.    Certificate and Opinion as to Conditions Precedent. .......................82
SECTION 12.05.    Statements Required in Certificate or Opinion. ...............................82
SECTION 12.06.    When Notes Disregarded. ...............................................................82
SECTION 12.07.    Rules by Trustee, Paying Agent and Registrar.................................83
SECTION 12.08.    Legal Holidays. ..............................................................................83
SECTION 12.09.    Governing Law................................................................................83
SECTION 12.10.    No Recourse Against Others............................................................83
SECTION 12.11.    Successors. .....................................................................................83
SECTION 12.12.    Multiple Originals. .........................................................................83
SECTION 12.13.    Table of Contents; Headings. ..........................................................83


Appendix A – Provisions Relating to the Notes
Appendix B – Form of Notes
Appendix C – Form of Security Agreement

INDENTURE dated as of [ ], 2005, by and among Loral Skynet Corporation, a Delaware corporation (the "***Company***"), the Guarantors from time to time parties hereto, and [ ], as trustee and as collateral agent.

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of the Notes.

## ARTICLE 1

### Definitions and Incorporation by Reference

SECTION 1.01.    Certain Definitions.

"***Additional Assets***" means:

(1)    any property, plant or equipment (including transponder capacity) used in a Related Business and regulatory rights acquired or regulatory rights settled relating to a Related Business;

(2)    the Capital Stock of a Person that becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Company or a Restricted Subsidiary; or

(3)    Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary;

provided, however, that any such Restricted Subsidiary described in clause (2) or (3) above is primarily engaged in a Related Business.

"***Additional Notes***" means Notes issued from time to time after the Issue Date pursuant to Section 4.01(b) of this Indenture.

"***Adjusted EBITDA***" of the Company for any period means EBITDA of the Company for such period less the following:

(1)    all ongoing cash restructuring expenses that are incurred as part of the ongoing emergence process, including any non-recurring fees, charges or other expenses directly related to the Transactions and the Restructuring Transactions that are paid in cash subsequent to the Issue Date;

(2)    income being recognized against items whose cash receipt occurred prior to the Issue Date;

(3)    all other non-cash income of the Company and its consolidated Restricted Subsidiaries except to the extent such non-cash income represents cash income received in a prior period; and

(4)     all income tax benefits of the Company and its consolidated Restricted Subsidiaries; and

(5)     dividends in respect of all Preferred Stock held by Persons other than the Company or a Wholly Owned Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company).

Adjusted EBITDA shall be annualized and prorated as provided in Section 4.01(b)(ii).

*"Affiliate"* of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, *"control"* when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms *"controlling"* and *"controlled"* have meanings correlative to the foregoing; provided, however, that notwithstanding anything else herein to the contrary, any Permitted Holder shall be deemed not to be an Affiliate of the Company, the Parent, any Intermediate Holding Company or any Subsidiary of any of such entities.

*"Asset Disposition"* means any sale, lease, issuance, transfer or other disposition (or series of related sales, leases, issuances, transfers or dispositions) by the Company or any Restricted Subsidiary, including any disposition by means of a merger, consolidation or similar transaction (each referred to for the purposes of this definition as a *"disposition"*), of, and any Event of Loss with respect to:

(1)     any shares of Capital Stock of a Restricted Subsidiary;

(2)     all or substantially all the assets of any division or line of business of the Company or any Restricted Subsidiary; or

(3)     any other assets of the Company or any Restricted Subsidiary outside the ordinary course of business (it being understood that (i) the lease (including prepaid leases) of transponders or any similar arrangement whereby the Company retains title to the transponder, or (ii) the disposition of any transponder, in each case with a fair market value of less than $25.0 million, shall be deemed to be in the ordinary course of business) of the Company or such Restricted Subsidiary.

Notwithstanding the foregoing, the following shall be deemed not to be Asset Dispositions:

(A)     a disposition to the Company or a Subsidiary Guarantor;

(B)     for purposes of Section 4.10 only, (i) a disposition that constitutes a Restricted Payment permitted by Section 4.05 or a Permitted Investment and (ii) a transaction governed by, and consummated in compliance with, Section 5.01;

(C)     the granting of a Permitted Lien;

(D)     dispositions of obsolete, damaged or worn out equipment no longer used or useful to the business of the Company and its Restricted Subsidiaries;

(E)     a disposition in any single transaction or a group of related transactions of assets, including transponders, with a fair market value of less than $100.0 million;

(F)     any disposition effected as part of any Restructuring Transactions;

(G)     any disposition of assets pursuant to any contract (i) assumed with the approval of the Bankruptcy Court under the Plan or (ii) entered into prior to the Issue Date and approved by the Bankruptcy Court;

(H)     any disposition of title of the Estrela do Sul satellite to the providers of insurance for such satellite;

(I)     a sale and leaseback transaction as described in Section 9.10 of that certain Lease Agreement dated August 18, 1999 by and between LAPS(HK) and APT Satellite Company Limited;

(J)     the exchange of transponder capacity as set forth in the December 10, 2002 and November 16, 2003 letter agreements entered into between the Company and APT Satellite Company Limited;

(K)     any transfer of equity interests in Earth Station Ecuador CIA Ltda.; and

(L)     any disposition effected pursuant to that certain letter agreement dated August 26, 2003, as amended on November 16, 2003 by and between the Company and APT Satellite Company Limited.

*"Attributable Debt"* in respect of a Sale/Leaseback Transaction means, as at the time of determination, the present value (discounted at the interest rate borne by the Notes, compounded semi-annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended); provided, however, that if such Sale/Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

*"Average Life"* means, as of the date of determination, with respect to any Indebtedness, the quotient obtained by dividing:

(1)     the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by the amount of such payment, by

(2)     the sum of all such payments.

*"Bankruptcy Interest"* means, with respect to any Indebtedness, all interest accruing thereon after the filing of a petition by or against the Company or any of its Subsidiaries under any Bankruptcy Law, in accordance with and at the rate (including any rate applicable upon any default or event of default, to the extent lawful) specified in the documents evidencing or governing such Indebtedness, whether or not the claim for such interest is allowed as a claim after such filing in any proceeding under such Bankruptcy Law.

*"Board of Directors"* with respect to a Person means the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, and unless specified to the contrary or inappropriate in the context, refers to the Board of Directors of the Company.

*"Business Day"* means each day which is not a Legal Holiday.

*"Capital Lease Obligation"* means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

*"Capital Stock"* of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, partnership interests and limited liability company interests but excluding any debt securities convertible into such equity.

*"Change of Control"* means the occurrence of any of the following events:

(1)     any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause (1) such person (the *"specified person"*) shall be deemed to have "beneficial ownership" of all shares that such specified person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company (including any successor to the Company pursuant to Article 5 of this Indenture) (for the purposes of this clause (1), such specified person shall be deemed to beneficially own any Voting Stock of the Company or any other Person held by any entity (a *"parent entity"*) if such specified person is the beneficial owner (as defined in this clause (1)), directly or indirectly, of more than 50% of the voting power of the Voting Stock of such parent entity;

(2)     individuals who on the Issue Date constituted the Parent Board or the Company Board (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Parent or the Company, as the case may be, was approved by (A) a vote of a majority of the directors of the Parent or the Company, as the case may be, then still in office who were either

directors on the Issue Date or whose election or nomination for election was previously so approved or (B) the Permitted Holders) cease for any reason to constitute a majority of such Board of Directors then in office; or

(3)     the adoption of a plan under Bankruptcy Law relating to the liquidation or dissolution of the Company.

*"Code"* means the Internal Revenue Code of 1986, as amended.

*"Collateral"* means any assets of the Company or any Guarantor defined as "Collateral" in any Collateral Document or otherwise subject to a security interest or lien in favor of the Collateral Agent to secure the payment of obligations under this Indenture or the Notes; provided, however, that in no case shall the Collateral include Excluded Collateral.

*"Collateral Agent"* means [_____] in its capacity as collateral agent under any Collateral Document until a successor replaces it, and thereafter means the successor.

*"Collateral Documents"* means, collectively, the Security Agreement and all other security agreements, pledge agreements, mortgages, deeds of trust, collateral agreements, control agreements, assignments, instruments, financing statements, filings and other documents that grant, evidence, set forth, provide notice of, govern or limit any security interest or lien in favor of the Collateral Agent in the Collateral, and all amendments thereto from time to time.

"*Commercially Reasonable Efforts*" means efforts that are reasonable under the circumstances as determined in good faith by the Board of Directors of the Company.  Such efforts do not, in any event, include the payment of money or the making of concessions by the Company or any Subsidiary (or any Affiliate or Permitted Holder) in order to obtain such concessions or making efforts to obtain consent or approval if in good faith the Board of Directors determines that such efforts are unlikely to be successful.

*"Company"* means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor and, for purposes of any provision contained herein and required by the TIA, each other obligor on the indenture securities.

*"Company Board"* means the Board of Directors of the Company.

"*Consolidated Cash Interest Expense*" for the Company, for any period, means Consolidated Interest Expense for the Company for such period, less the following, without duplication:

(1)     any non-cash interest expense of the Company and its consolidated Restricted Subsidiaries;

(2)     any interest payments on the Notes that are paid in-kind; and

(3)     any amount included pursuant to clause (7) of the definition of the term "Consolidated Interest Expense".

*"Consolidated Coverage Ratio"* as of any date of determination means the ratio of (x) the aggregate amount of EBITDA of the Company for the period of the most recent four consecutive fiscal quarters ending at least 50 days prior to the date of such determination to (y) Consolidated Cash Interest Expense of the Company for such four fiscal quarters; provided, however, that:

(1)     if the Company or any Restricted Subsidiary has Incurred any Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is an Incurrence of Indebtedness, or both, then EBITDA and Consolidated Cash Interest Expense for such period shall be calculated after giving effect on a pro forma basis to such Indebtedness and the use of proceeds thereof as if such Indebtedness had been Incurred on the first day of such period and such proceeds had been applied as of such date;

(2)     if the Company or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Coverage Ratio, then EBITDA and Consolidated Cash Interest Expense for such period shall be calculated on a pro forma basis as if such discharge had occurred on the first day of such period and as if the Company or such Restricted Subsidiary had not earned the interest income actually earned, if any, during such period in respect of cash or Temporary Cash Investments used to repay, repurchase, defease or otherwise discharge such Indebtedness;

(3)     if, since the beginning of such period, the Company or any Restricted Subsidiary shall have made any Asset Disposition, then EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets which were the subject of such Asset Disposition for such period, or increased by an amount equal to EBITDA (if negative) directly attributable thereto for such period, and Consolidated Cash Interest Expense for such period shall be reduced by an amount equal to the Consolidated Cash Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries in connection with such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Cash Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Company and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale);

(4)     if, since the beginning of such period, the Company or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person which becomes a Restricted Subsidiary) or an acquisition of assets having a fair market value in excess of $10.0 million, then EBITDA and Consolidated Cash Interest Expense for such period shall be calculated after giving pro

forma effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

(5)     if, since the beginning of such period, any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Disposition, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (3) or (4) above if made by the Company or a Restricted Subsidiary during such period, then EBITDA and Consolidated Cash Interest Expense for such period shall be calculated after giving pro forma effect thereto as if such Asset Disposition, Investment or acquisition had occurred on the first day of such period.

For purposes of this definition, whenever pro forma effect is to be given to an acquisition of assets, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness Incurred in connection therewith, the pro forma calculations shall be determined in good faith by a responsible financial or accounting Officer of the Company.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness, but if the remaining term of such Interest Rate Agreement is less than twelve months, then such Interest Rate Agreement shall only be taken into account for that portion of the period equal to the remaining term thereof).

The Consolidated Interest Expense attributable to interest on any Indebtedness under a revolving credit facility the outstanding principal balance of which is required to be computed on a pro forma basis in accordance with the foregoing shall be computed based on the average daily balance of such Indebtedness during the applicable period, provided, that such average daily balance shall take into account the amount of any repayment of Indebtedness under such revolving credit facility during the applicable period, to the extent such repayment permanently reduced the commitments or amounts available to be borrowed under such facility.

If the calculation of the Consolidated Coverage Ratio as of any date of determination would include any period prior to the Issue Date, Consolidated Interest Expense and EBITDA for such four fiscal quarter period shall be determined (i) by annualizing the Consolidated Interest Expense and EBITDA for all completed fiscal quarters starting after the Issue Date and ending prior to such date of determination for which financial statements are available or (ii) if no fiscal quarters have started after the Issue Date and ended prior to such date of determination for which financial statements are available, in the case of Consolidated Interest Expense, by using the Indebtedness and Capital Lease Obligations balances and expense amounts as of such date of determination and for the period from the Issue Date to such date of determination and in the case of EBITDA, by using estimated EBITDA for the period from the Issue Date to such date of determination as reasonably determined by the Board of Directors of the Company in good faith.

*"Consolidated Interest Expense"* of the Company means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries, plus, to the extent not included in such total interest expense, and to the extent incurred by the Company or its Restricted Subsidiaries, without duplication:

(1)     interest expense attributable to Capital Lease Obligations and the interest expense attributable to leases constituting part of a Sale/Leaseback Transaction;

(2)     amortization of debt discount and debt issuance cost;

(3)     capitalized interest;

(4)     non-cash interest expense;

(5)     commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(6)     net payments pursuant to Interest Rate Agreements;

(7)     dividends in respect of all Preferred Stock held by Persons other than the Company or a Wholly Owned Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company); provided, however, that such dividends will be multiplied by a fraction the numerator of which is one and the denominator of which is one minus the effective combined tax rate of the issuer of such Preferred Stock (expressed as a decimal) for such period (as estimated by the chief financial officer of the Company in good faith);

(8)     interest incurred in connection with Investments in discontinued operations;

(9)     interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is Guaranteed by (or secured by the assets of) the Company or any Restricted Subsidiary; and

(10)     the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Company) in connection with Indebtedness Incurred by such plan or trust.

*"Consolidated Net Income"* of the Company means, for any period, the net income of the Company and its consolidated Subsidiaries (computed before giving effect to the payment of dividends on Capital Stock); provided, however, that there shall not be included in such Consolidated Net Income:

(1)     any net income of any Person (other than the Company) if such Person is not a Restricted Subsidiary, except that:

(A) subject to the exclusion contained in clause (3) below, the Company's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income in an amount equal to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a Restricted Subsidiary, to the limitations contained in clause (2) below); and

(B) the Company's equity in a net loss of any such Person for such period shall be included in determining such Consolidated Net Income;

(2) any net income of any Restricted Subsidiary if such Restricted Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Company, except that:

(A) subject to the exclusion contained in clause (3) below, the net income of any such Restricted Subsidiary for such period shall be included in such Consolidated Net Income in an amount equal to the aggregate amount of cash actually distributed by such Restricted Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to another Restricted Subsidiary, to the limitation contained in this clause (2));

(B) the net loss of any such Restricted Subsidiary for such period shall be included in determining such Consolidated Net Income; and

(C) the net income of any such Restricted Subsidiary for such period shall not be excluded solely as a result of the restrictions on the payment of dividends and the making of distributions set forth in any Credit Facility Incurred pursuant to Section 4.06(b)(1) or Indebtedness under Section 4.06(b)(11) or (12), or any Credit Linked Hedge related to any such Credit Facility;

(3) any gain or loss (other than any cash loss) realized upon the sale or other disposition of any assets of the Company, its consolidated Subsidiaries or any other Person (including pursuant to any sale-and-leaseback arrangement) which is not sold or otherwise disposed of in the ordinary course of business and any gain (but not loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(4) extraordinary gains or losses;

(5) the cumulative effect of a change in accounting principles and its effect as shown on the Company's consolidated statement of income for such period;

(6) any non-recurring fees, charges or other expenses directly related to the Transactions; and

(7) any charges recorded as a result of implementing SFAS 123R (expensing of stock options) and any related interpretations or amendments thereto.

Notwithstanding the foregoing, for the purposes of Section 4.05 only, there shall be excluded from Consolidated Net Income any repurchases, repayments or redemptions of Investments, proceeds realized on the sale of Investments or return of capital to the Company or a Restricted Subsidiary to the extent such repurchases, repayments, redemptions, proceeds or returns increase the amount of Restricted Payments permitted under Section 4.05(a)(3)(D).

*"Credit Facilities"* means one or more debt facilities, capital markets transactions or commercial paper facilities or any other agreement or instrument providing for or evidencing the extension of credit with banks, finance companies, funds, insurance companies, vendors or institutional lenders providing revolving credit loans, term loans, notes, bonds, debentures, receivables financing (including through the sale of receivables) or letters of credit, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

*"Credit Linked Hedge"* means, with respect to a Credit Facility, all Hedging Obligations that (1) constitute or are directly related to Indebtedness Incurred under such Credit Facility or are entered into with counterparties who are lenders or Affiliates of lenders under such Credit Facility, (2) are secured by all collateral securing such Credit Facility on an equal and ratable basis and guaranteed by all guarantors of such Credit Facility on a pari passu basis, in each case pursuant to common documentation, (3) contains covenants not less favorable to the Noteholders than those set forth in such Credit Facility, and (4) are permitted under this Indenture.

*"Currency Agreement"* means in respect of a Person any foreign exchange contract, currency swap agreement or other similar agreement designed to protect such Person against fluctuations in currency values.

*"Default"* means any event which is, or after notice or passage of time or both would be, an Event of Default.

*"Disqualified Stock"* means, with respect to any Person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(1) matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(2) is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock; or

(3)     is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part;

in each case on or prior to the date that is 367 days after the Stated Maturity of the Notes; provided, however, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the first anniversary of the Stated Maturity of the Notes shall not constitute Disqualified Stock if:

(A)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described in Sections 4.04 and 4.10; and

(B)     any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to this Indenture; provided, however, that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such Person.

*"Domestic Subsidiary"* means any Restricted Subsidiary that is not a Foreign Subsidiary.

*"EBITDA"* of the Company for any period means the sum of Consolidated Net Income of the Company, plus the following to the extent deducted in calculating such Consolidated Net Income:

(1)     all income tax expense of the Company and its consolidated Restricted Subsidiaries;

(2)     Consolidated Interest Expense (but computed without any increase for the amount set forth in clause (7) of the definition of Consolidated Interest Expense);

(3)     depreciation and amortization expense of the Company and its consolidated Restricted Subsidiaries (excluding amortization expense attributable to a prepaid operating activity item that was paid in cash in a prior period);

(4)     all other non-cash charges of the Company and its consolidated Restricted Subsidiaries (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period);

(5)     all ongoing cash restructuring expenses that are incurred as part of the ongoing emergence process;

(6)     equity losses recognized in Consolidated Net Income; and

(7)     gains/losses recognized on foreign exchange,

in each case for such period.

Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation and amortization and non-cash charges of, a Restricted Subsidiary shall be added to Consolidated Net Income to compute EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net income of such Restricted Subsidiary was included in calculating Consolidated Net Income and only if a corresponding amount would be permitted at the date of determination to be dividended to the Company by such Restricted Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to such Restricted Subsidiary or its stockholders.

*"ESOP"* means any employee stock ownership plan or a trust established by the Company or any of its Subsidiaries for the benefit of their employees.

*"Event of Loss"* means, with respect to any property or asset (tangible or intangible, real or personal), any loss, destruction or damage of the property or asset or any actual condemnation, seizure or taking by the power of eminent domain or otherwise of the property or asset, or confiscation of the property or asset or the requisition of the use of the property or asset, in any such case only to the extent such loss, destruction or damage is valued in good faith by the Board of Directors of the Company to be in excess of $100.0 million.

*"Exchange Act"* means the U.S. Securities Exchange Act of 1934, as amended.

*"Excluded Collateral"* means:

(1)     any contract, agreement or instrument that by its terms would be violated, breached or terminated by an assignment as Collateral under any Collateral Document (other than to the extent that such terms prohibiting such assignment in any contract, agreement or Instrument would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the applicable Uniform Commercial Code or any successor provision or provisions and other than to the extent that the Company has obtained a consent from the relevant counterparty to such assignment);

(2)     any property subject to a Lien permitted by clauses (iii), (iv), (vi), (ix), (xiii), (xvii), (xviii), (xix), (xx) and (xxi) of the definition of Permitted Liens in this Indenture, to the extent that the contractual arrangements governing such Lien prohibit the granting of a security interest hereunder in such property;

(3)     assets sold to a Person which is not the Company or a Restricted Subsidiary in compliance with this Indenture;

(4)     assets owned by a Restricted Subsidiary after the sale of such Person or the release of the Guarantee of such Person pursuant to Section 10.06 or the release of the Liens pursuant to Section 11.05;

(5)     any domestic deposit account (i) for which the Trustee is the depositary, and (ii) of which all or a substantial portion of the funds on deposit are used for funding (w) payroll, (x) 401(k) and other retirement plans and employee benefits, including rabbi trusts for deferred compensation, (y) health care benefits and (z) escrow arrangements (*e.g.*, environmental indemnity accounts) or (iii) (not already subject to the other clauses of this clause (e)) with an aggregate average ten consecutive Business Day daily balance of all funds in all such other domestic deposit accounts for all Obligors not in excess of $2.0 million;

(6)     any individual parcel of owned real estate with a fair market value, as reasonably determined in good faith by the Company, not in excess of $1,000,000;

(7)     any real estate leasehold interest;

(8)     any outstanding stock of a direct or indirect Foreign Subsidiary of the Company in excess of 65% of the total combined voting stock (as determined for United States federal income tax purposes) of such Foreign Subsidiary;

(9)     any property of any Foreign Subsidiary that is a Guarantor which requires governmental regulatory approval for such Guarantor to grant the lien on such Collateral so long as the Guarantor is using or has used Commercially Reasonable Efforts to obtain such consent;

(10)     any letter of credit rights for a specified purpose to the extent the beneficiary is required by applicable law to apply the proceeds of such letter of credit rights for a specified purpose;

(11)     any assets securing Indebtedness permitted under Section 4.06(b)(4) to the extent the documents securing such Indebtedness prohibit such assets from securing other Indebtedness;

(12)     cash deposits, not exceeding $5,000,000 at any time, securing Hedging Obligations permitted under this Indenture;

(13)     assets subject to the Amended and Restated Satellite Agreement dated August 26, 2003, as amended, by and between the Company and APT Satellite Company Limited, until such time as the requirements set forth in Section 13 thereof have been satisfied;

(14)     any collateral provided pursuant to that certain Security Agreement dated October __, 2004 entered into among the Company, APT Satellite Company Limited and Bank of China (Hong Kong) Limited;

(15)     equity interests in Earth Station Ecuador CIA Ltda.;

(16) other assets designated from time to time by the Company with a fair market value as determined in good faith by the Company in the aggregate for all assets designated not to exceed $5.0 million; and

(17) transponders on Telstar 18 that are subject to the leasehold or ownership interest of APT Satellite Company Limited and the common elements on the satellite associated therewith.

"*Excluded Contributions*" means the Net Cash Proceeds received by the Company after the Issue Date from (a) contributions to its common equity capital and (b) the sale (other than to an ESOP) of Capital Stock (other than Disqualified Stock) of the Company, in each case designated within 60 days of the receipt of such Net Cash Proceeds as Excluded Contributions pursuant to an Officers' Certificate, the cash proceeds of which are excluded from the calculation set forth in clause(a) 3(B) of the first paragraph of Section 4.05.

"*Foreign Required Minority Shares*" means Capital Stock of a Foreign Subsidiary that is required by the applicable laws and regulations of such foreign jurisdiction to be owned by the government of such foreign jurisdiction or individual or corporate citizens of such foreign jurisdiction in order for such Foreign Subsidiary to transact business in such foreign jurisdiction.

"*Foreign Subsidiary*" means any Restricted Subsidiary that is not organized under the laws of the United States, any state thereof or the District of Columbia.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect as of the Issue Date, including those set forth in:

(1) the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants;

(2) statements and pronouncements of the Financial Accounting Standards Board;

(3) such other statements by such other entity as approved by a significant segment of the accounting profession; and

(4) the rules and regulations of the SEC governing the inclusion of financial statements (including pro forma financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC.

All ratios and computations based on GAAP in this Indenture will be computed in conformity with GAAP. Computations shall not be adjusted as a result of any recharacterization of the Notes for accounting purposes.

"*Group Member*" means the Parent and any Subsidiary of the Parent.

*"Guarantee"* means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such Person:

(1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

*"Guarantor"* means any Person that Guarantees any of the Notes pursuant to the terms of this Indenture, in each case unless and until such Person is released from its obligations under its Guaranty pursuant to the terms of this Indenture.

*"Guaranty"* means a Guarantee by a Guarantor of the Company's Obligations with respect to the Notes.

*"Hedging Obligations"* of any Person means the obligations of such Person pursuant to any Interest Rate Agreement or Currency Agreement.

*"Holder"* or *"Noteholder"* means the Person in whose name a Note is registered on the Registrar's books.

*"Incur"* means issue, assume, Guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary. The term *"Incurrence"* when used as a noun shall have a correlative meaning. Solely for purposes of determining compliance with Section 4.06, (1) amortization of debt discount or the accretion of principal with respect to a non-interest bearing or other discount security, (2) the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Capital Stock in the form of additional Capital Stock of the same class and with the same terms, and (3) unrealized losses or charges in respect of Hedging Obligations (including those resulting from the application of FAS 133), in each case will be deemed not to be Incurrences of Indebtedness.

*"Indebtedness"* means, with respect to any Person on any date of determination (without duplication):

(1) the principal in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar

instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(2)     all Capital Lease Obligations of such Person and all Attributable Debt in respect of Sale/Leaseback Transactions entered into by such Person;

(3)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable, progress payments and milestone payments arising in the ordinary course of business);

(4)     all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

(5)     the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person, the principal amount of such Preferred Stock to be determined in accordance with this Indenture;

(6)     all obligations of the types referred to in clauses (1) through (5) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

(7)     all obligations of the types referred to in clauses (1) through (6) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the fair market value of such property or assets at such date of determination and the amount of the obligation so secured; and

(8)     to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that in the case of Indebtedness sold at a discount, the amount of such Indebtedness at any time will be the accreted value thereof at such time.

Indebtedness shall not include:

(a) any obligation of the Company or any Restricted Subsidiary as of the Issue Date under the sale and leaseback transaction as described in Section 9.10 of that certain Lease Agreement dated August 18, 1999 by and between Loral Asia Pacific Satellite (HK) Limited and APT Satellite Company Limited;

(b) $36,264,800 in payments to be made by the Company to APT under that Amended and Restated Agreement dated as of August 26, 2003, as further amended on November 16, 2003, by and between the Company and APT Satellite Company Limited (as it may be amended pursuant to the Letter Agreement dated August 26, 2003);

(c) orbital or like payments pursuant to contracts with satellite manufacturers; and

(d) payment obligations to third parties for rights to an orbital slot.

*"Indenture"* means this Indenture as amended or supplemented from time to time.

*"Independent Qualified Party"* means an investment banking firm, accounting firm or appraisal firm of reputable standing as determined by the Board of Directors of the Company; provided, however, that such firm is not an Affiliate of the Company.

*"Interest Payment Date"* means each interest payment date as specified in the form of Note attached hereto as Appendix B.

*"Interest Rate Agreement"* means, in respect of a Person, any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement designed to reduce such Person's interest expense or protect such Person against fluctuations in interest rates.

*"Investment"* in any Person means any direct or indirect advance, loan (other than advances to customers in the ordinary course of business that are recorded as accounts receivable on the balance sheet of the lender) or other extensions of credit (including by way of Guarantee or similar arrangement) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person. Except as otherwise provided for herein, the amount of an Investment shall be its fair value at the time the Investment is made and without giving effect to subsequent changes in value. The term "Investment" shall not include any arrangements with any service provider for the joint sale of services or other teaming arrangement pursuant to which the Company or any Restricted Subsidiary contributes transponder capacity and/or related assets.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and Section 4.05:

(1) "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the fair market value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; and

(2)     any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by the Board of Directors.

Any action taken by an Unrestricted Subsidiary shall not be deemed to have been taken directly or indirectly by the Company or any Restricted Subsidiary.

*"Issue Date"* means [ ], 2005.

*"LAPS(HK)"* means Loral Asia Pacific Satellite (HK) Limited, a corporation with limited liability organized under the laws of Hong Kong, and its successors.

*"Lien"* means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

*"MHR"* means MHR Fund Management LLC and any successor thereto.

*"Moody's"* means Moody's Investors Service, Inc.

*"Net Available Cash"* from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other non-cash form), in each case net of:

(1)     all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses incurred, and all Federal, state, provincial, foreign and local taxes required to be accrued as a liability under GAAP, as a consequence of such Asset Disposition;

(2)     all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law, be repaid out of the proceeds from such Asset Disposition;

(3)     all distributions and other payments required to be made to minority interest holders in Restricted Subsidiaries as a result of such Asset Disposition; and

(4)     the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the property or other assets disposed in such Asset Disposition and retained by the Company or any Restricted Subsidiary after such Asset Disposition.

**"Net Cash Proceeds"** means, with respect to any issuance or sale of Capital Stock, the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

**"Notes"** means the notes issued under this Indenture.

**"Obligations"** means all obligations for principal, premium, interest penalties, fees, indemnifications, reimbursements and other amounts payable.

**"Obligor"** means each of the Company and each Guarantor.

**"Officer"** means the Chairman of the Board, the Chief Executive Officer, the President, any Vice President, the Chief Financial Officer, the Treasurer or the Secretary of the Company.

**"Officers' Certificate"** means a certificate signed by two Officers.

**"Opinion of Counsel"** means a written opinion from legal counsel who is reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Trustee.

**"Parent"** means Loral Space & Communciations Inc., a Delaware corporation, and its successors.

**"Parent Board"** means the Board of Directors of the Parent.

**"Payment Default"** means a Default arising pursuant to Section 6.01(1) or 6.01(2).

**"Permitted Holders"** means MHR and any Related Party of MHR.

**"Permitted Investment"** means an Investment by the Company or any Restricted Subsidiary in:

(1)     the Company, a Subsidiary Guarantor or a Person that will, upon the making of such Investment, become a Subsidiary Guarantor; provided, however, that the primary business of such Subsidiary Guarantor is a Related Business;

(2)     another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Company or a Subsidiary Guarantor; provided, however, that such Person's primary business is a Related Business;

(3)     cash and Temporary Cash Investments;

(4)     receivables owing to the Company or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as the Company or any such Restricted Subsidiary reasonably deems necessary under the circumstances and may include prudent vendor financing terms as determined in good faith by the Company;

(5)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     loans or advances to employees made in the ordinary course of business of the Company or such Restricted Subsidiary not exceeding in the aggregate at any time $1.0 million;

(7)     stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or in satisfaction of judgments;

(8)     any Person to the extent such Investment represents the non-cash portion of the consideration received for an Asset Disposition as permitted pursuant to Section 4.10;

(9)     any Person where such Investment was acquired by the Company or any of its Restricted Subsidiaries (A) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (B) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(10)     any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection, and lease, workers' compensation, performance and similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(11)     any Person to the extent such Investments consist of Hedging Obligations otherwise not prohibited under Section 4.06;

(12)     any Person, not otherwise permitted to be made pursuant to the preceding clauses of this definition, in an aggregate amount which, when taken together with all other Investments made pursuant to this clause (12) at any one time outstanding, does not exceed $50.0 million; and

(13)     the exchange of transponder capacity as contemplated in agreements with APT Satellite Company Limited in effect as of the Issue Date.

*"Permitted Liens"* means (i) Liens for taxes, assessments, governmental charges or claims with respect to amounts not yet delinquent or amounts being contested in good faith by appropriate legal proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; (ii) contractual, statutory and common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen or other similar Liens arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate legal proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; (iii) Liens on cash or cash equivalents incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (iv) Liens on cash or cash equivalents incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money); (v) easements, rights-of-way, municipal and zoning ordinances and similar charges, encumbrances, title defects or other irregularities affecting real property that do not, individually or in the aggregate, materially interfere with the ordinary course of business of the Company or any of its Restricted Subsidiaries; (vi) Liens (including extensions and renewals thereof) upon real or personal property acquired after the Issue Date; provided that (a) such Lien is created solely for the purpose of securing Indebtedness Incurred, in accordance with Section 4.06 of this Indenture, to finance (or refinance) the cost (including the cost of improvement, transportation, development and design, installation, integration or construction) of the item of property or assets subject thereto and such Lien is created prior to, at the time of or within 6 months after the later of the acquisition, the completion of construction or the commencement of full operation of such property, (b) the principal amount of the Indebtedness secured by such Lien does not exceed 100% of such cost (plus, in the case of any refinancing Indebtedness referred to above, premiums, accrued interest, fees and expenses), and (c) any Lien permitted by this clause shall not extend to or cover any property or assets other than such item of property or assets, any improvements on such item, and proceeds thereof; (vii) leases or subleases of real property granted to others that do not materially interfere with the ordinary course of business of the Company and its Restricted Subsidiaries; (viii) any interest or title of a lessor in the property subject to any capitalized lease or operating lease; (ix) Liens on property of, or on shares of Capital Stock or Indebtedness of, any Person existing at the time such Person becomes, or such property becomes a part of, any Restricted Subsidiary; provided that such Liens (a) do not extend to or cover any property or assets of the Company or any Restricted Subsidiary other than the property or assets so acquired and (b) were not incurred in contemplation of the acquisition thereof; (x) Liens in favor of the Company or any Restricted Subsidiary; (xi) Liens arising from the rendering of a final judgment or order against the Company or any Restricted Subsidiary that does not give rise to a Default or an Event of Default provided that any reserve or other appropriate provision that shall be required in conformity with GAAP shall have been made therefor; (xii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods with respect to amounts not yet delinquent or amounts being contested in good faith by appropriate legal proceedings promptly instituted and diligently conducted and for which a reserve or other

appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; (xiii) Liens upon a satellite and components thereof during the period in which such satellite is being constructed, <u>provided</u> that (a) such Liens (1) are for the benefit of only the manufacturer of such satellite or components and (2) secure only the obligation of the Company or any Restricted Subsidiary to pay the purchase price for such satellite or components and (b) such Liens are actually released upon, or prior to, the completion of construction of such satellite and prior to the launch or commencement of full operations of such satellite; (xiv) Liens securing the Notes; (xv) Liens arising under this Indenture in favor of the Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred under this Indenture, <u>provided</u>, that such Liens are solely for the benefit of the trustees, agents, or representatives, in their capacities as such and not for the benefit of the holders of such Indebtedness; (xvi) set-off, chargeback and other rights of depositary and collection banks and other regulated financial institutions with respect to money or instruments of the Company or its Restricted Subsidiaries on deposit with or in the possession of such institutions; (xvii) Liens arising from the deposit of funds or securities in trust for the purpose of decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such decreasing or defeasing of Indebtedness are permitted under Section 4.05 hereof; (xviii) Liens securing Indebtedness Incurred pursuant to and in compliance with Section 4.06(b)(1) hereof; (xix) Liens on transponders leased by the Company or a Restricted Subsidiary to customers to secure obligations to such customers under such leases; (xx) Liens, in addition to those provided for in the foregoing clauses (i) through (xix) securing obligations valued in good faith by the Board of Directors of the Company to be in an aggregate amount not to exceed $40.0 million; and (xxi) Liens on existence on the Issue Date.

   *"Person"* means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

   *"Plan"* means the Debtors' Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of Loral Space & Communications Ltd., et al., as confirmed by the United States Bankruptcy Court, Southern District of New York, including all exhibits and other attachments thereto.

   *"Preferred Stock"*, as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

   *"principal"* of a Note means the principal of the Note plus the premium, if any, payable on the Note which is due or overdue or is to become due at the relevant time.

   *"Record Date"* means each record date as specified in the form of Note attached hereto as <u>Appendix B</u>.

*"Refinance"* means, in respect of any Indebtedness, to refinance, extend, renew or refund, or to issue other Indebtedness in exchange or replacement for, such Indebtedness. *"Refinanced"* and *"Refinancing"* shall have correlative meanings.

*"Refinancing Indebtedness"* means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Subsidiary existing on the Issue Date or Incurred in compliance with this Indenture, including Indebtedness that Refinances Refinancing Indebtedness; provided, however, that:

(1)     such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced; and

(2)     such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding or committed (plus fees and expenses, including any premium and defeasance costs) under the Indebtedness being Refinanced;

provided further, however, that Refinancing Indebtedness shall not include (A) Indebtedness of a Subsidiary that Refinances Indebtedness of the Company or (B) Indebtedness of the Company or a Restricted Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

*"Related Business"* means any business in which the Company and its Restricted Subsidiaries were engaged on the Issue Date and any business related, ancillary or complementary to any business in which the Company and its Restricted Subsidiaries were engaged on the Issue Date, after giving effect to the Restructuring Transactions.

*"Related Party"* means (1) any controlling stockholder, controlling member, general partner, majority owned Subsidiary, or spouse or immediate family member (in the case of an individual) of any Permitted Holder, (2) any estate, trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons holding a controlling interest of which consist solely of one or more Permitted Holders and/or such other Persons referred to in the immediately preceding clause (1), (3) any executor, administrator, trustee, manager, director or other similar fiduciary of any Person referred to in the immediately preceding clause (2) acting solely in such capacity, (4) any investment fund or other entity controlled by, or under common control with, MHR or the principals that control MHR, or (5) upon the liquidation of any entity of the type described in the immediately preceding clause (4), the former partners or beneficial owners thereof to the extent of the Voting Stock formerly held by such entity.

*"Restricted Payment"* with respect to any Person means:

(1)     the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such Person) or similar payment to the direct or indirect holders of its Capital Stock (other than (A) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock), (B) dividends or distributions payable solely to the Company or a Restricted Subsidiary, and (C) dividends or other

distributions made by a Subsidiary that is not a Wholly Owned Subsidiary to the holders of any class of its Capital Stock on a pro rata basis);

(2)     the purchase, redemption or other acquisition or retirement for value of any Capital Stock of the Company or the Parent held by any Person (other than the Company or a Restricted Subsidiary) or of any Capital Stock (other than Disqualified Stock) of a Restricted Subsidiary held by any Affiliate of the Company (other than a Restricted Subsidiary), including the exercise of any option to exchange any Capital Stock (other than Disqualified Stock) into any other securities of any Person (other than into Capital Stock of the Company that is not Disqualified Stock);

(3)     the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Obligations of such Person (other than (A) payments made solely to the Company or a Subsidiary Guarantor and (B) the refinancing of Subordinated Obligations through the Incurrence of Refinancing Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such Incurrence); or

(4)     the making of any Investment (other than a Permitted Investment) in any Person.

For clarity, payments under tax sharing agreements, shared services agreements and management agreements are not Restricted Payments.

*"Restricted Subsidiary"* means any Subsidiary of the Company that is not an Unrestricted Subsidiary.

*"Restructuring Transactions"* has the meaning given to it in the Plan.

*"S&P"* means Standard & Poor's Ratings Group.

*"Sale/Leaseback Transaction"* means an arrangement relating to property owned by the Company or a Restricted Subsidiary on the Issue Date or thereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or a Restricted Subsidiary leases it from such Person.

*"SEC"* means the U.S. Securities and Exchange Commission.

*"Securities Act"* means the U.S. Securities Act of 1933, as amended.

*"Security Agreement"* means the Security Agreement made by the Company and the Subsidiary Guarantors in favor of the Collateral Agent, substantially in the form of Appendix C attached hereto, as such may be amended, supplemented or otherwise modified from time to time.

"***Series A Preferred Stock***" means the 12% Series A Non-Convertible Preferred Stock of the Company

"***Significant Subsidiary***" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

"***Stated Maturity***" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"***Subordinated Obligation***" means, with respect to a Person, any Indebtedness of such Person (whether outstanding on the Issue Date or thereafter Incurred) which is subordinated in right of payment to the Notes or a Guaranty of such Person, as the case may be, pursuant to a written agreement to that effect.

"***Subsidiary***" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Voting Stock is at the time owned or controlled, directly or indirectly, by:

    (1)    such Person;

    (2)    such Person and one or more Subsidiaries of such Person; or

    (3)    one or more Subsidiaries of such Person.

Unless otherwise specified or inappropriate in the context, "Subsidiary" means a Subsidiary of the Company.

"***Subsidiary Guarantor***" means any Guarantor that is a Subsidiary of the Company.

"***Supplemental Guaranty Agreement***" means a supplemental indenture, in a form satisfactory to the Trustee, pursuant to which a Guarantor guarantees the Company's obligations with respect to the Notes on the terms provided for in this Indenture.

"***Temporary Cash Investments***" means any of the following:

    (1)    U.S. dollars, or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

    (2)    any investment in direct obligations of the United States of America or any agency thereof or obligations guaranteed by the United States of America, any member nation of the European Union or any agency thereof having maturities of not more than one year from the date of acquisition;

(3)     investments in demand accounts, time deposit accounts, certificates of deposit and money market deposits maturing within 360 days of the date of acquisition thereof issued by a bank or trust company which is organized under the laws of the United States of America, any State thereof or any foreign country recognized by the United States of America, and which bank or trust company has capital, surplus and undivided profits aggregating in excess of $500 million (or the foreign currency equivalent thereof) and has outstanding debt which is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) or any money-market fund sponsored by a registered broker dealer or mutual fund distributor;

(4)     repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (1) above entered into with a bank meeting the qualifications described in clause (2) above;

(5)     investments in commercial paper, maturing not more than 360 days after the date of acquisition, issued by an entity (other than an Affiliate of the Company) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P;

(6)     investments in securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's; and

(7)     instruments equivalent to those referred to in clauses (1) to (6) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Restricted Subsidiary organized in such jurisdiction, all as determined in good faith by the Company.

*"TIA"* or *"Trust Indenture Act"* means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the Issue Date.

*"Transactions"* means the issuance of the Notes on the Issue Date, the Rights Offering (as defined in the Plan), and the other transactions contemplated by the Plan.

*"Trust Officer"* means the Chairman of the Board, the President or any other officer or assistant officer of the Trustee assigned by the Trustee to administer its corporate trust matters.

*"Trustee"* means [     ] in its capacity as trustee until a successor replaces it, and thereafter means the successor. Where appropriate in the context, for purposes of Articles 6 and 7 of this Indenture, the term "Trustee" shall include the Collateral Agent.

*"Uniform Commercial Code"* means the New York Uniform Commercial Code as in effect from time to time.

*"Unperfected Collateral"* means,

(1) any vehicle covered by a certificate of title having a fair market value of less than $250,000; and

(2) any assets of any Guarantor located outside the United States; provided, however, that this clause (2) shall not include any contract between LAPS (HK) and APT and shall not include satellites and transponders.

*"Unrestricted Subsidiary"* means (a) XTAR, LLC, a Delaware limited liability company and its successors (other than the Company or a Restricted Subsidiary), (b) XTAR Services LLC, a Delaware limited liability company and its successors (other than the Company or a Restricted Subsidiary) and (c):

(1) any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary;

in each case unless and until such Subsidiary is designated a Restricted Subsidiary for purposes of this Indenture.

The Board of Directors of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary) that is not a Significant Subsidiary to be an Unrestricted Subsidiary.

The Board of Directors of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided, however, that immediately after giving effect to such designation (A) the Company could Incur $1.00 of additional Indebtedness under Section 4.06(a) and (B) no Default or Event of Default shall have occurred and be continuing. Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

*"U.S. Government Obligations"* means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable at the issuer's option.

*"Voting Stock"* of a Person means all classes of Capital Stock or other interests of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

*"Wholly Owned Subsidiary"* means a Restricted Subsidiary all the Capital Stock of which is owned by the Company or one or more Wholly Owned Subsidiaries.

SECTION 1.02.    Other Definitions.

| Term | Defined in Section |
|---|---|
| "Affiliate Transaction" | 4.10(a) |
| "After-Acquired Property" | 11.01(b) |
| "Asset Disposition Offer" | 4.09(a)(3) |
| "Bankruptcy Law" | 6.01 |
| "Cash/PIK Interest" | 4.01(b)(iii) |
| "Change of Control Offer" | 4.04(b) |
| "Consideration" | 11.05(b)(i) |
| "covenant defeasance option" | 8.01(b) |
| "Custodian" | 6.01 |
| "Default Rate" | 4.01(c) |
| "Determination Notice" | 4.01(b)(iii) |
| "Event of Default" | 6.01 |
| "Expiration Date" | 4.01(b)(iv) |
| "Guaranteed Obligations" | 10.01 |
| "Interest Determination" | 4.01(b)(iii) |
| "legal defeasance option" | 8.01(b) |
| "Legal Holiday" | 12.08 |
| "Mandatory PIK Date" | 4.01(b)(ii) |
| "Paying Agent" | 2.03 |
| "PIK Notes" | 4.01(b)(ii) |
| "Redemption Date" | 5 of the Notes |
| "Relevant Interest Payment Date" | 4.01(b)(iii) |
| "Registrar" | 2.03 |
| "Released Collateral" | 11.05(b) |
| "Requisite Objection Notice" | 4.01(b)(iv) |
| "Successor Company" | 5.01(a) |
| "Valuation Date" | 11.05(b)(i) |

In addition, terms defined in Appendix A shall have the meanings set forth therein.

SECTION 1.03.    Incorporation by Reference of Trust Indenture Act.  This Indenture is subject to the mandatory provisions of the TIA which are incorporated by reference in and made a part of this Indenture.  The following TIA terms have the following meanings:

"Commission" means the SEC;

"indenture securities" means the Notes and the Guaranties;

"indenture security holder" means a Noteholder;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the indenture securities means the Company and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04.     Rules of Construction.  Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)     "or" is not exclusive;

(4)     "including" means including without limitation;

(5)     words in the singular include the plural and words in the plural include the singular;

(6)     unsecured Indebtedness shall not be deemed to be subordinate in right of payment to secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(7)     the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(8)     the principal amount of any Preferred Stock shall be (i) the maximum liquidation preference plus accrued and unpaid dividends of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(9)     all references to the date the Notes were originally issued shall refer to the Issue Date;

(10)     in the event of a conflict between the definitions set forth in Section 1.01 and the definitions set forth in the first paragraph of this Indenture, the definitions set forth in Section 1.01 shall govern;

(11)     for purposes of determining compliance with any U.S. dollar-denominated restriction contained in this Indenture, the U.S. dollar-equivalent amount denominated in

a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness, or made, in the case of Investments or other amounts; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced; and

(12) notwithstanding any other provision under this Indenture, the maximum amount of Indebtedness, Investments and other amounts that the Company and its Restricted Subsidiaries may incur pursuant to this Indenture shall not be deemed to be exceeded, with regard to any outstanding Indebtedness, Investments or other amounts, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

## ARTICLE 2

### The Notes

SECTION 2.01.     Form and Dating.  Provisions relating to the Notes are set forth in <u>Appendix A</u> and <u>Appendix B</u> attached hereto which are hereby incorporated in and expressly made part of this Indenture. The Notes and the Trustee's certificate of authentication shall be substantially in the form of <u>Appendix B</u>.  The Notes may have notations, legends or endorsements required by law, stock exchange rule, agreements to which the Company is subject, if any (<u>provided</u>, that any such notation, legend or endorsement is in a form reasonably acceptable to the Company and the Trustee). Each Note shall be dated the date of its authentication. The terms of the Notes set forth in <u>Appendix B</u> are part of the terms of this Indenture.

SECTION 2.02.     Execution and Authentication.  Two Officers shall sign the Notes for the Company by manual or facsimile signature. The Company's seal, if any, may be impressed, affixed, imprinted or reproduced on the Notes and may be in facsimile form.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture. The Trustee shall authenticate Notes in the amounts and at the times specified in Section 2.2 of <u>Appendix A</u> attached hereto.

The Trustee may appoint an authenticating agent reasonably acceptable to the Company to authenticate the Notes. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as any Registrar, Paying Agent or agent for service of notices and demands.

SECTION 2.03.     Registrar and Paying Agent. The Company shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange (the *"Registrar"*) and an office or agency where Notes may be presented for payment (the *"Paying Agent"*). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may have one or more co-registrars and one or more additional paying agents. The term *"Registrar"* includes any appointed co-registrar and the term *"Paying Agent"* includes any additional paying agent.

The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent or co-registrar not a party to this Indenture, which shall incorporate the terms of the TIA. The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of each such agent. If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Company or any Wholly Owned Subsidiary incorporated or organized within The United States of America may act as Paying Agent, Registrar, co-registrar or transfer agent.

The Company initially appoints the Trustee as Registrar and Paying Agent in connection with the Notes.

SECTION 2.04.     Paying Agent To Hold Money in Trust. Not less than one Business Day prior to each due date of the principal, premium and interest on any Note, the Company shall deposit with the Paying Agent a sum sufficient to pay such principal, premium and interest when so becoming due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Noteholders and the Trustee all money held by the Paying Agent for the payment of principal of, premium or interest on the Notes and shall promptly notify the Trustee of any default by the Company in making any such payment. If the Company or a Subsidiary acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it as a separate trust fund. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by the Paying Agent. Upon payment in full to or a receipt by the Trustee of all the principal, premium and interest due under this Indenture, the Paying Agent (if other than the Company or a Subsidiary) shall have no further liability for the money delivered to the Trustee. Upon any bankruptcy, reorganization or similar proceeding with respect to the Company, the Trustee shall serve as Paying Agent for the Notes.

SECTION 2.05.     Noteholder Lists. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Noteholders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Company shall furnish to the Trustee, in writing, at least five Business Days before each

payment date, including each Interest Payment Date, and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Noteholders.

SECTION 2.06.    Transfer and Exchange.  The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer, and only to the extent permitted by, and consummated in compliance with, Section 2.3 of Appendix A.  When a Note is presented to the Registrar or a co-registrar with a request to register a transfer, the Registrar shall register the transfer as requested if the requirements of this Indenture and Section 8-401(a) of the Uniform Commercial Code are met.  When Notes are presented to the Registrar or a co-registrar with a request to exchange them for an equal principal amount of Notes of other denominations, the Registrar shall make the exchange as requested if the same requirements are met.  The Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection with the transfer or exchange of the Notes (other than any such transfer taxes or other similar governmental charges payable upon exchange pursuant to Section 2.07, 2.09, 3.06 or 9.05).

SECTION 2.07.    Replacement Notes.  If a mutilated Note is surrendered to the Registrar or if the Holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Company shall issue, and the Trustee shall authenticate, a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met and the Holder satisfies any other reasonable requirements of the Trustee.  If required by the Trustee or the Company, such Holder shall furnish an indemnity bond sufficient in the reasonable judgment of the Company and the Trustee to protect the Company, the Trustee, the Paying Agent, the Registrar and any co-registrar from any loss which any of them may suffer if a Note is replaced.  The Company and the Trustee may charge the Holder for their expenses in replacing a Note.

Every replacement Note shall be an additional Obligation of the Company.

SECTION 2.08.    Outstanding Notes.

(a)    Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation and those described in this Section 2.08 as not outstanding.  Subject to Section 12.06, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

(b)    If a Note is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee and the Company receive proof satisfactory to them that the replaced Note is held by a bona fide purchaser.

(c)    If the Paying Agent (other than the Company or an Affiliate thereof) segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and the Paying Agent is not prohibited from paying such money to the Noteholders on that date pursuant to the terms of this Indenture or otherwise, then on and after that date interest on such Notes (or portions thereof) ceases to accrue.

SECTION 2.09.     Temporary Notes.  The Company may prepare, and the Trustee shall authenticate, temporary Notes.  Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Company reasonably considers appropriate for temporary Notes.  If the Company so reasonably elects, the Company shall prepare and the Trustee shall authenticate permanent Definitive Notes and deliver them in exchange for such temporary Notes.

SECTION 2.10.     Cancellation.  The Company immediately upon the redemption of any Notes shall deliver such Notes and at any other time may deliver Notes, to the Trustee for cancellation, which Notes the Trustee shall cancel promptly upon such delivery.  The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee and no one else shall cancel and destroy (subject to the record retention requirements of the Exchange Act and the Trustee's policies) all Notes surrendered for registration of transfer, exchange, payment or cancellation and deliver a certificate of such destruction to the Company.  The Company may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation.

SECTION 2.11.     Defaulted Interest.  If the Company defaults in a payment of interest on the Notes, the Company shall pay defaulted interest (plus interest on such defaulted interest to the extent lawful) in any lawful manner and in compliance with the provisions of Section 4.01(b) as to whether such interest shall be paid in cash, in-kind through the issuance of Additional Notes or some combination thereof.  The Company may pay the defaulted interest to the Persons who are Noteholders on a subsequent special record date.  The Company shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail to each Noteholder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.12.     CUSIP Numbers.  The Company in issuing the Notes may use "CUSIP" numbers and corresponding "ISINs" (if then generally in use) and, if so, the Trustee may use "CUSIP" numbers and corresponding "ISINs" in notices of redemption as a convenience to Holders; provided, however, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.

ARTICLE 3

Redemption

SECTION 3.01.     Notices to Trustee.  If the Company elects to redeem Notes pursuant to Section 5 of the Notes, it shall notify the Trustee in writing of the Redemption Date and the principal amount of Notes to be redeemed (such principal amount, the "***Proposed Redemption Amount***" and, any such notice, the "***Company Redemption Notice***").

The Company shall give each Company Redemption Notice to the Trustee at least 90 days before the applicable Redemption Date unless the Trustee consents to a shorter period.

Such notice shall be accompanied by an Officers' Certificate and an Opinion of Counsel from the Company to the effect that such redemption will comply with the conditions herein.

SECTION 3.02.     Selection of Notes To Be Redeemed.

(a)     Within ten (10) days after receipt by the Trustee of the Company Redemption Notice, the Trustee shall notify each then record holder of Notes (each, a "**Record Holder**") of the Company's proposal to redeem up to the Proposed Redemption Amount and shall instruct, in reasonable detail, each such Record Holder to notify the Trustee within the ten (10) days after such Record Holder's receipt of the Trustee Notification as to (A) whether such Record Holder objects to such redemption, and (B) if such Record Holder does not so object, the maximum aggregate principal amount of Notes held of record by such Record Holder that such Record Holder would voluntarily have redeemed by the Company in connection with such Company Redemption Notice (the "**Voluntary Redemption Amount**"(such notice from the Trustee to the Record Holders, the "**Trustee Notification**"),

(b)     If the Proposed Redemption Amount is less than the aggregate principal amount of Notes then outstanding, the Trustee shall select the Notes to be redeemed from outstanding Notes not previously called for redemption as follows:

(i)     if the sum of all Voluntary Redemption Amounts (such sum, the "**Total Voluntary Redemption Amount**") in respect of the applicable redemption exceeds the Proposed Redemption Amount, then, in respect of each Record Holder, such amount of such Record Holder's then outstanding Notes as is equal to the product of (x) the Proposed Redemption Amount multiplied by (y) a fraction, the numerator of which is such Record Holder's Voluntary Redemption Amount and the denominator of which is the Total Voluntary Redemption Amount; and

(ii)     if the Total Voluntary Redemption Amount is less than the Proposed Redemption Amount, then, in respect of each Record Holder, (A) first, such Record Holder's Voluntary Redemption Amount and (B) then, such amount of such Record Holder's then remaining outstanding Notes (the "Remaining Notes Amount") as is equal to the product of (x) the Proposed Redemption Amount less the Total Voluntary Redemption Amount multiplied by (y) a fraction, the numerator of which is such Record Holder's Remaining Notes Amount and the denominator or which is the sum of all Remaining Notes Amounts in respect of all Record Holders).

(c)     Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Trustee shall notify the Company promptly of the Notes or portions of Notes to be redeemed.

(d)     For purposes of Section 3.02(a), the notice from the Trustee shall be deemed to have been received on the fifth Business Day after deposit in the mails, pursuant to the requirements of Section 12.02, and each Holder not responding within the ten day period set forth in Section 3.02 or whose response shall not clearly provide the information required in such response shall be conclusively deemed to have objected to the applicable redemption.

SECTION 3.03.    Notice of Redemption.  At least 30 days but not more than 60 days before a Redemption Date, the Company shall mail a notice of redemption by first-class mail to each Holder of Notes to be redeemed at such Holder's registered address.

The notice shall identify the Notes to be redeemed and shall state:

(1)    the Redemption Date;

(2)    the redemption price;

(3)    the name and address of the Paying Agent;

(4)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(5)    if fewer than all the outstanding Notes are to be redeemed, the identification and principal amounts of the particular Notes to be redeemed in compliance with Section 3.02;

(6)    that, unless the Company defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on the Notes (or portion thereof) called for redemption shall cease to accrue on and after payment in full of the redemption price;

(7)    that no representation is made as to the correctness or accuracy of the CUSIP number or corresponding ISIN, if any, listed in such notice or printed on the Notes; and

(8)    if applicable, that the Holders have the right to object to and prevent such redemption, and in such event, such redemption notice shall further comply with the applicable requirements of Section 5 of the Notes.

At the Company's request, the Trustee shall give the notice of redemption in the Company's name and at the Company's expense.  In such event, the Company shall provide the Trustee with the information required by this Section 3.03.

SECTION 3.04.    Effect of Notice of Redemption.  Once notice of redemption is mailed, Notes called for redemption shall become due and payable on the Redemption Date and at the redemption price stated in the notice.  Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, plus accrued interest to the Redemption Date (subject to the right of Holders of record on the relevant Record Date to receive interest due on the related Interest Payment Date).  Failure to give notice or any defect in the notice to any Holder shall not affect the validity of the notice to any other Holder.

SECTION 3.05.    Deposit of Redemption Price.  One Business Day prior to the Redemption Date, the Company shall deposit with the Paying Agent (other than the Company or an Affiliate thereof) money sufficient to pay the redemption price of and accrued

interest on all Notes to be redeemed on that date other than Notes or portions of Notes called for redemption which have been delivered by the Company to the Trustee for cancellation.

SECTION 3.06. Notes Redeemed in Part. Upon surrender of a Note that is redeemed in part, the Company shall execute and the Trustee shall authenticate for the Holder (at the Company's expense) a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

## ARTICLE 4

### Covenants

SECTION 4.01. Payment of Notes.

(a) *General.* The Company shall promptly pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture. Subject to Section 2.08(c), principal, premium, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Company or an Affiliate thereof, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available U.S. funds and designated for and sufficient to pay all principal, premium, if any, and interest then due. All payments shall be made in New York, New York unless the Trustee otherwise specifies. Notwithstanding any provision of this Indenture or the Notes to the contrary, the Company shall be entitled to withhold from any payment required in respect of the Notes any amount determined by the Company to be required by law to be withheld.

(b) *Payment of Interest.*

(i) The Company shall pay interest on the Notes at the rate of 14.0% per annum payable semi-annually in arrears in cash, subject only to certain conditions specified below. In certain circumstances more particularly described in this Section 4.01(b), a portion of the interest (including, without limitation, any defaulted interest plus interest on such defaulted interest) from time to time due and payable on the Notes may be paid in-kind through the issuance of Additional Notes in lieu of cash.

(ii) Notwithstanding the provisions of Section 4.01(b)(i), interest on the Notes shall not be payable in cash, but rather shall be payable in-kind through the issuance of Additional Notes in lieu of cash (the "*PIK Notes*") if and to the full extent that the amount of such interest (including, without limitation, any defaulted interest plus interest on such defaulted interest) to be paid on any Interest Payment Date (the "*Mandatory PIK Date*"), would exceed the amount that equals the product of (A) 50% of the Company's 12-month Adjusted EBITDA for the period ending as of the end of the most recently completed fiscal quarter which ended at least 50 days prior to the date of Interest Determination (as defined below) immediately preceding such Mandatory PIK Date, which Adjusted EBITDA shall be annualized if necessary consistently with the annualization provisions set forth in the definition of Consolidated Coverage Ratio (as certified by the Company's Chief Financial Officer), multiplied by (B) a fraction the

numerator of which is the number of days from and including the last Mandatory PIK Date (or in the case of the first Interest Payment Date, from and including the Issue Date) to but not including the current Mandatory PIK Date, and the denominator of which is 365 or 366 days, as applicable.

(iii)     Notwithstanding the provisions of Section 4.01(b)(i), not later than thirty (30) days prior to any Interest Payment Date, the Board of Directors shall make the following determination:  whether any portion or all of the interest to be paid on such Interest Payment Date (the "*Relevant Interest Payment Date*") if otherwise payable in cash in accordance with Section 4.01(b)(i) as modified by Section 4.01(b)(ii) (the entire amount of such interest so payable in cash but for the provisions of this clause (iii), the "*Cash/PIK Interest*") should be paid in cash or, instead, in PIK Notes (such determination, the "*Interest Determination*").  If the Board of Directors makes the Interest Determination that the entire amount of the Cash/PIK Interest be paid in cash, then the Cash/PIK Interest shall be payable only in cash.  If the Board makes the Interest Determination that any portion or the entire amount of the Cash/PIK Interest be paid in PIK Notes, a notice of such Interest Determination (a "*Determination Notice*"), shall be sent to the Holders not more than thirty (30) nor fewer than fifteen (15) days prior to the Relevant Interest Payment Date.  The Determination Notice shall describe in reasonable detail, among other things:  (A) the Interest Determination, (B) the methods by which the Holders may respond to such Determination Notice in accordance with Section 4.01(b)(iv) (including a contact at the Company and the address and facsimile number of such contact), (C) the Interest Payment Date to which such Determination Notice relates, and (D) the Expiration Date (as defined below).  The Determination Notice shall be deemed delivered on the fifth Business Day after deposit in the mails pursuant to the requirements of Section 12.02.

(iv)     If within ten (10) Business Days following the date that a Determination Notice is deemed delivered to the Holders in accordance with Section 4.01(b)(iii), written notice is received by the Company from the Holders of at least two-thirds (2/3) in principal amount of the then outstanding Notes directing that the Cash//PIK Interest being paid be paid in cash and not in PIK Notes (such notices from the Holders of such two-thirds or greater amount, collectively, the "*Requisite Objection Notice*"), then the entire amount of the Cash/PIK Interest shall be paid in cash.  If the Requisite Objection Notice is not received by the Company by the expiration of such ten (10) Business Day-period (the "*Expiration Date*"), then the Cash/PIK Interest or the relevant portion thereof shall be paid in PIK Notes to the extent set forth in the Determination Notice and the balance, if any, of such Cash/PIK Interest shall be paid in cash.

(v)     If the Company is required to pay interest in-kind through the issuance of Additional Notes in lieu of cash pursuant to paragraphs (ii) and (iv) above, then the Company shall promptly deliver to the Trustee an Officers' Certificate notifying the Trustee of the aggregate amount of such Additional Notes to be issued, and specifying the amount of Additional Notes to be issued through the issuance of Additional Definitive Notes and the amounts to be issued through increases in the Global Notes.  On or after the date of such Officers' Certificate but not less than 2 Business Days prior to the

Relevant Interest Payment Date, the Company shall deliver to the Trustee any Additional Definitive Notes to be issued, which Additional Definitive Notes shall have been duly executed by the Company in the manner provided in Section 2.02. On the Relevant Interest Payment Date the Trustee shall record increases in the Global Notes and authenticate Additional Definitive Notes, as appropriate, in the aggregate principal amounts required to pay such portion of the interest.

(vi)     Each Additional Note is an additional obligation of the Company and the Guarantors and shall be governed by, and entitled to the benefits of, this Indenture and shall be subject to the terms of this Indenture (including the Guaranty provisions), shall rank pari passu with and be subject to the same terms (including the rate of interest from time to time payable thereon) as all other Notes (except, as the case may be, with respect to the issuance date and aggregate principal amount), and shall have the benefit of all Liens securing Notes.

(c)     *Default Rate Interest.* Notwithstanding any other provision of this Indenture or the Notes, the Company shall pay interest (including Bankruptcy Interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand in compliance with the provisions of Section 4.01(b) as to whether such interest shall be paid in cash, in-kind through the issuance of Additional Notes or some combination thereof at a rate that is 2.0% per annum in excess of the then applicable interest rate on the Notes to the extent lawful (the *"Default Rate"*). In addition, the Company shall pay interest (including Bankruptcy Interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand in compliance with the provisions of Section 4.01(b) as to whether such interest shall be paid in cash, in-kind through the issuance of Additional Notes or some combination thereof at the Default Rate to the extent lawful.

SECTION 4.02.     [Intentionally Left Blank].

SECTION 4.03.     Compliance Certificate. The Company shall deliver to the Trustee within 90 days after the end of each fiscal year of the Company an Officers' Certificate stating whether or not the signers know of any Default that occurred during such period. If they do, the certificate shall describe the Default, its status and what action the Company is taking or proposes to take with respect thereto. The Company also shall comply with TIA § 314(a)(4).

SECTION 4.04.     Change of Control.

(a)     Upon the occurrence of a Change of Control, each Holder shall have the right to require that the Company repurchase such Holder's Notes at a purchase price in accordance with the schedule set forth in Section 7 of the Notes, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), in accordance with the terms of Section 4.04(b). In the event that at the time of such Change of Control, the terms of any Credit Facility prohibit the Company from making a Change of Control Offer or from purchasing the Notes pursuant to this Section 4.04, the Company shall, prior to the mailing of the notice to Holders provided for in Section 4.04(b) below but, in any event within 30 days

following any Change of Control: (1) repay in full all Indebtedness outstanding under the relevant Credit Facility; or (2) obtain the requisite consent under the relevant Credit Facility to permit the purchase of the Notes as provided for in Section 4.04(b).

(b)     Within 30 days following any Change of Control, the Company shall mail a notice to each Holder with a copy to the Trustee (the *"Change of Control Offer"*) stating:

(1)     that a Change of Control has occurred and that such Holder has the right to require the Company to purchase such Holder's Notes at a purchase price in accordance with the schedule set forth in Section 7 of the Notes, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant Record Date to receive interest on the relevant Interest Payment Date);

(2)     the circumstances and relevant facts regarding such Change of Control (including information with respect to pro forma historical income, cash flow and capitalization, in each case after giving effect to such Change of Control);

(3)     the purchase date (which shall not be earlier than 30 days nor later than 60 days from the date such notice is mailed);

(4)     the instructions, reasonably determined by the Company, consistent with this Section 4.04, that a Holder must follow in order to have its Notes purchased; and

(5)     if applicable, that the Company has the option to redeem any Notes not purchased in the Change of Control Offer, and setting forth the applicable redemption price or the formula used to determine the applicable redemption price.

(c)     Holders electing to have a Note purchased will be required to surrender the Note, with an appropriate form duly completed, to the Company at the address specified in the notice at least three Business Days prior to the purchase date. Holders will be entitled to withdraw their election if the Trustee or the Company receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note which was delivered for purchase by the Holder and a statement that such Holder is withdrawing its election to have such Note purchased.

(d)     On the purchase date, all Notes purchased by the Company under this Section 4.04 shall be delivered by the Company to the Trustee for cancellation, and the Company shall pay the purchase price plus accrued and unpaid interest, if any, to the Holders entitled thereto.

(e)     Notwithstanding the foregoing provisions of this Section 4.04, the Company shall not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Company and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer.

(f)     The Company shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section 4.04.  To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.04, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.04 by virtue of its compliance with such securities laws or regulations.

(g)     If, as of the date of any supplemental indenture, pursuant to which the parties seek to waive or modify the provisions of Section 4.04 or any relevant definition, no Change of Control has occurred and the Company is not aware of any pending, proposed or threatened Change of Control, the provisions of this Indenture and the Notes relative to the Company's obligation to make an offer to purchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the holders of a majority in principal amount of the Notes.

SECTION 4.05.     Limitation on Restricted Payments.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, make a Restricted Payment if at the time the Company or such Restricted Subsidiary makes such Restricted Payment:

(1)     a Default or Event of Default shall have occurred and be continuing (or would result therefrom);

(2)     the Company could not Incur an additional $1.00 of Indebtedness under Section 4.06(a); or

(3)     the aggregate amount of such Restricted Payment and all other Restricted Payments since the Issue Date made pursuant to this Section 4.05(a)(3) and all Restricted Payments since the Issue Date made pursuant to Section 4.05 (b)(3) and (b)(7) would exceed the sum of (without duplication):

(A)     50% of the Consolidated Net Income of the Company accrued during the period (treated as one accounting period) from the beginning of the fiscal quarter immediately following the fiscal quarter during which the Issue Date occurs to the end of the most recent fiscal quarter ended at least 45 days prior to the date of such Restricted Payment (or, in case such Consolidated Net Income shall be a deficit, minus 100% of such deficit); plus

(B)     100% of the aggregate Net Cash Proceeds received by the Company from the issuance or sale of its Capital Stock (other than Disqualified Stock and other than Excluded Contributions) subsequent to the Issue Date (other than an issuance or sale to a Subsidiary of the Company or to an ESOP) and 100% of any cash capital contribution received by the Company from its stockholders subsequent to the Issue Date; plus

(C)     the amount by which Indebtedness of the Company is reduced on the Company's balance sheet upon the conversion or exchange (other than by a Subsidiary of the Company) subsequent to the Issue Date of any Indebtedness of the Company convertible or exchangeable for Capital Stock (other than Disqualified Stock) of the Company (less the amount of any cash, or the fair value of any other property, distributed by the Company upon such conversion or exchange); plus

(D)     an amount equal to the sum of (x) the net reduction in the Investments (other than Permitted Investments) made by the Company or any Restricted Subsidiary in any Person resulting from repurchases, repayments or redemptions of such Investments by such Person, proceeds realized on the sale of such Investment and proceeds representing the return of capital (excluding amounts that contribute to Consolidated Net Income), in each case received by the Company or any Guarantor and (y) the portion (proportionate to the Company's equity interest in such Subsidiary) of the fair market value of the net assets of an Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary; provided, however, that the foregoing sum shall not exceed, in the case of any such Person or Unrestricted Subsidiary, the amount of Investments (excluding Permitted Investments) previously made (and treated as a Restricted Payment) by the Company or any Restricted Subsidiary in such Person or Unrestricted Subsidiary;

but in no event shall the sum under this subparagraph (a)(3) of Section 4.05 increase as the result of any action or occurrence under Section 4.05(b).

(b)     The provisions of Section 4.05(a) shall not prohibit (but in the case of subparagraphs (b)(3), (b)(4), (b)(5), (b)(6) ,(b)(7) and (b)(8) of this Section 4.05, only if no Event of Default or Payment Default has occurred and is continuing or would result therefrom):

(1)     any Restricted Payment made out of (A) the Net Cash Proceeds of the substantially concurrent issuance or sale of, or made by conversion into or exchange for, Capital Stock of the Company (other than Disqualified Stock and other than Capital Stock issued or sold to a Subsidiary of the Company or an ESOP) and (B) any Excluded Contributions;

(2)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations of the Company or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent issuance or sale of, Indebtedness which is permitted to be Incurred pursuant to Section 4.06;

(3)     payment of any dividends within 60 days after the date of declaration thereof if at such date of declaration such dividend complied with this Section 4.05;

(4)     dividends payable on the Series A Preferred Stock or any Preferred Stock issued to redeem, purchase, retire or otherwise acquire any Preferred Stock;

(5)     dividends by the Company on and repurchases by the Company of Disqualified Stock;

(6)     purchase by the Company or a Restricted Subsidiary of Equity Interests in a Restricted Subsidiary from another Person; and

(7)     Restricted Payments in an aggregate amount which, when taken together with all other Restricted Payments made pursuant to this clause (7) and any amounts applied under Sections 4.09(a)(1) and 4.09(a)(2), at any one time outstanding do not exceed $200.0 million; and

(8)     any purchase, repurchase, redemption or other acquisition by the Company of the Series A Preferred Stock.

(c)     The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of the Restricted Payment of the assets proposed to be transferred by the Company or such Restricted Subsidiary, as the case may be, in accordance with the Restricted Payment. The fair market value of any non-cash Restricted Payment shall be determined in good faith by an executive officer of the Company (if such fair market value is less than $1.0 million), or by the Board of Directors (in all other cases), in each case pursuant to an Officers' Certificate delivered to the Trustee.

SECTION 4.06.     Limitation on Indebtedness.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, Incur, directly or indirectly, any Indebtedness; provided, however, that the Company and any Restricted Subsidiary shall be entitled to Incur Indebtedness if, on the date of such Incurrence and after giving effect thereto on a pro forma basis, no Default has occurred and is continuing and the Consolidated Coverage Ratio exceeds 1.25 to 1.

(b)     Notwithstanding the foregoing paragraph (a), the Company and its Restricted Subsidiaries shall be entitled to Incur any or all of the following Indebtedness:

(1)     Indebtedness of the Company and any Restricted Subsidiary Incurred pursuant to Credit Facilities of any Group Member; provided, however, that after giving effect to any such Incurrence, the aggregate principal amount of all Indebtedness of the Company and the Restricted Subsidiaries Incurred under this clause (1) and then outstanding does not exceed $200.0 million;

(2)     Indebtedness of the Company owing to and held by a Wholly Owned Subsidiary or Indebtedness of a Restricted Subsidiary owing to and held by the Company or a Wholly Owned Subsidiary; provided, however, that (A) any subsequent issuance or transfer of any Capital Stock which results in any such Wholly Owned Subsidiary ceasing to be a Wholly Owned Subsidiary or any subsequent transfer of such Indebtedness (other than to the Company or a Wholly Owned Subsidiary) shall be deemed, in each case, to constitute the Incurrence of such Indebtedness by the obligor thereon and (B) if the Company or a Subsidiary Guarantor is the obligor on such Indebtedness, such

Indebtedness is expressly subordinated to the prior payment in full in cash of all obligations with respect to the Notes or such Subsidiary Guarantor's Guaranty;

(3)     the Notes (including Additional Notes issued pursuant to Section 4.01(b)) and any Guaranties;

(4)     Indebtedness of a Restricted Subsidiary Incurred and outstanding on or prior to the date on which such Subsidiary was acquired by the Company (other than Indebtedness Incurred in anticipation of or in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Subsidiary became a Subsidiary or was acquired by the Company); provided, however, that on the date of such acquisition and after giving pro forma effect thereto, the Consolidated Coverage Ratio of the Company is equal to or greater than the Consolidated Coverage Ratio of the Company prior to the consummation of the transaction or series of related transactions;

(5)     Refinancing Indebtedness in respect of Indebtedness Incurred pursuant to Section 4.06(a) or pursuant to clause (3), (4) or (13) of this Section 4.06(b) or this clause (5); provided, however, that to the extent such Refinancing Indebtedness directly or indirectly Refinances Indebtedness of a Subsidiary Incurred pursuant to clause (4), such Refinancing Indebtedness shall be Incurred only by such Subsidiary;

(6)     Hedging Obligations consisting of (A) Interest Rate Agreements entered into for nonspeculative purposes, and (B) Currency Agreements entered into for nonspeculative purposes;

(7)     obligations in respect of performance, bid and surety bonds and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business;

(8)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within two Business Days of its Incurrence;

(9)     Indebtedness consisting of any Guarantee by the Company or any Restricted Subsidiary of Indebtedness of the Company or any Restricted Subsidiary Incurred after the Issue Date to the extent such Indebtedness was permitted by this Indenture to be Incurred at the time of its Incurrence (other than Indebtedness Incurred pursuant to Section 4.06(b)(5) (to the extent of the limitation therein));

(10)     Indebtedness consisting of indemnification, adjustment of purchase price, earn-out or similar obligations (other than Guarantees of Indebtedness), in each case incurred in connection with the acquisition or disposition of assets otherwise permitted by this Indenture;

(11)     (a)(i)  Indebtedness Incurred to finance the purchase, construction, launch, insurance for and other costs with respect to two additional satellites at any given time

after the Issue Date and (ii) other Indebtedness Incurred to finance the purchase, construction, launch, insurance for and other costs with respect to additional satellites after the Issue Date, in an aggregate principal amount which, when taken together with all other Indebtedness under this clause (11)(a) at any one time outstanding does not exceed the greatest amount at any one time previously outstanding under clause (11)(a)(i), and (b) Indebtedness Incurred to finance the cost (including the cost of design, development, construction, installation, improvement, transportation or integration) of equipment (other than satellites but including transponder capacity) or inventory (other than satellites but including transponder capacity) acquired by the Company or a Restricted Subsidiary after the Issue Date;

(12)     Indebtedness of the Company and any Restricted Subsidiary (other than Indebtedness described in clauses (1)-(11) and clause (13)) in an aggregate principal amount which, when taken together with all other Indebtedness outstanding under this clause (12) at any one time does not exceed $125.0 million; and

(13)     Indebtedness constituting Disqualified Stock issued in connection with the refinancing of the Series A Preferred Stock.

(c)     Notwithstanding the foregoing, the Company shall not, and shall not permit any Subsidiary Guarantor to, Incur any Indebtedness pursuant to Section 4.06(b) if the proceeds thereof are used, directly or indirectly, to Refinance any Subordinated Obligations of the Company or any Subsidiary Guarantor unless such new Indebtedness shall be subordinated to the Notes or the applicable Guaranty to at least the same extent as such Subordinated Obligations.

(d)     For purposes of determining compliance with this Section 4.06, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Section 4.06(a) or 4.06(b), (1) the Company, in its sole discretion, is entitled to classify such item of Indebtedness at the time of Incurrence, in any manner in compliance with this Section 4.06, (2) the Company will only be required to include the amount and type of such Indebtedness in one of the above categories and (3) the Company will be entitled to divide and classify and reclassify from time to time an item of Indebtedness in more than one of the categories of Indebtedness described above.

(e)     Notwithstanding Section 4.06(a) or 4.06(b), the Company shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Indebtedness, unless such Indebtedness is Incurred in compliance with the other provisions of this Indenture, including Sections 4.07, and 4.11.

SECTION 4.07.     Limitation on Liens.  The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist or become effective any Lien to secure Indebtedness on or with respect to any of its assets, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens. Notwithstanding anything else herein or elsewhere to the contrary, any Permitted Lien under clauses (vi), (xviii) and (xxi) of the definition thereof securing Indebtedness Incurred (***"Permitted Senior Financings"***) pursuant to and in compliance with Sections 4.06(b)(1),

4.06(b)(11) and 4.06(b)(12) may be superior in priority to any Lien securing the Notes pursuant to this Agreement or any of the Collateral Documents. The Trustee shall upon the request of the Company execute and deliver any Lien subordination and related intercreditor agreement requested by the Persons providing the Permitted Senior Financings, which agreement may contain provisions, among others, relating to subordination of the Lien under the Collateral Documents on the collateral subject to such Permitted Secured Financings, sale of such collateral, waivers of rights relating to certain actions relating to the collateral in bankruptcy and similar proceedings and other matters requested by the Persons providing the Permitted Senior Financing.

      SECTION 4.08.    Limitation on Restrictions on Distributions from Restricted Subsidiaries. The Company shall not, and shall not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock to the Company or a Restricted Subsidiary or pay any Indebtedness owed to the Company or a Restricted Subsidiary, (b) make any loans or advances to the Company or a Restricted Subsidiary or (c) transfer any of its property or assets to the Company or a Restricted Subsidiary, except:

      (1)    with respect to clauses (a), (b) and (c),

      (A)    any encumbrance or restriction contained in the terms of any Credit Facility entered into pursuant to Section 4.06(b)(1), 4.06(b)(11) or 4.06(b)(12) if (i) the Company determines at the time any such Indebtedness is Incurred (or in the case of revolving Indebtedness, at the time such commitment is established) and at the time of any modification of the terms of any documentation governing such Indebtedness that any such encumbrance or restriction will not materially affect the Company's ability to make principal and interest payments on the Notes and (ii) the encumbrance or restriction is not materially more disadvantageous to the Holders than is customary in comparable Indebtedness for companies similarly situated (as determined by the Board of Directors in good faith);

      (B)    any encumbrance or restriction contained in any indenture if such indenture is substantially identical to this Indenture;

      (C)    any encumbrance or restriction with respect to a Restricted Subsidiary pursuant to an agreement relating to any Indebtedness Incurred by such Restricted Subsidiary on or prior to the date on which such Restricted Subsidiary was acquired by the Company (other than Indebtedness Incurred in anticipation of or in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Restricted Subsidiary became a Restricted Subsidiary or was acquired by the Company) and outstanding on such date;

(D)    any encumbrance or restriction pursuant to an agreement effecting an amendment, modification, restatement, renewal, replacement or Refinancing of Indebtedness Incurred pursuant to an agreement referred to in Section 4.08(1)(B) or (C) or this clause (D) or contained in any amendment to an agreement referred to in Section 4.08(1)(B) or (C) or this clause (D); provided, however, that the encumbrances and restrictions with respect to such Restricted Subsidiary contained in any such refinancing agreement or amendment, taken as a whole, either satisfy the requirements of clause (A) above or are no less favorable to the Noteholders than encumbrances and restrictions with respect to such Restricted Subsidiary contained in such predecessor agreements;

(E)    any encumbrance or restriction arising under any applicable law, rule, regulation or order; and

(F)    any encumbrance or restriction if (i) such encumbrance or restriction is set forth in the documentation governing a Credit Linked Hedge, (ii) such encumbrance or restriction is not less favorable to the Noteholders than the corresponding encumbrance or restriction set forth in the Credit Facility related to such Credit Linked Hedge, and (iii) the corresponding encumbrance or restriction set forth in such Credit Facility is permitted under this covenant;

(G)    any encumbrance or restriction in effect on the Issue Date; and

(H)    any encumbrance or restriction entered into in good faith contained in any shareholders or similar agreement relating to any Subsidiary that is not a Wholly-Owned Subsidiary; and

(2)    with respect to clause (c) only,

(A)    any encumbrance or restriction consisting of a customary nonassignment provision in a lease, license or similar ordinary course of business agreement;

(B)    any restriction contained in a security agreement or mortgage securing Indebtedness of a Restricted Subsidiary to the extent such restriction restricts the transfer of the property subject to such security agreement or mortgage; and

(C)    any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition.

SECTION 4.09.    Limitation on Sales of Assets and Subsidiary Stock.

(a) The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, consummate any Asset Disposition unless:

(1) except in the case of an Event of Loss, the Company or such Restricted Subsidiary receives consideration at the time of such Asset Disposition at least equal to the fair market value (including as to the value of all non-cash consideration), as determined in good faith by the Board of Directors, of the shares and assets subject to such Asset Disposition; provided, however, that the Company may count as consideration received for such Asset Disposition any amount available under Section 4.05(a)(3) and 4.05(b)(7);

(2) except in the case of an Event of Loss, at least 50% of the consideration thereof received (exclusive of earnouts or orbital payments) by the Company or such Restricted Subsidiary is in the form of cash or cash equivalents or Additional Assets; provided, however, that the Company may count as cash received for such Asset Disposition any amount available under Section 4.05(a)(3) and 4.05(b)(7) ; and

(3) an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company (or such Restricted Subsidiary, as the case may be):

(A) to the extent the Company is required to do so by the terms of any such Indebtedness, to prepay, repay, purchase, repurchase, redeem, defease or otherwise acquire or retire for value Indebtedness of the Company or any Wholly Owned Subsidiary that was secured by a Lien on the asset that was the subject of such Asset Disposition (in each case other than (i) Indebtedness constituting Subordinated Obligations and (ii) Indebtedness owed to the Company or an Affiliate of the Company) from time to time within 540 days from the later of the date of such Asset Disposition or the receipt of such Net Available Cash (such later date being herein called, the *"Measurement Date"*);

(B) to the extent the Company elects, to enter into contractual agreements to acquire Additional Assets from time to time within 540 days from the Measurement Date and consummates such acquisitions within two years after the execution of such contracts; and

(C) to the extent of the balance of such Net Available Cash after application in accordance with clauses (A) and (B), to make an offer to the holders of the Notes to purchase Notes pursuant to and subject to the conditions contained in this Indenture (an *"Asset Disposition Offer"*).

Notwithstanding the foregoing provisions of this Section 4.09, the Company and the Restricted Subsidiaries shall not be required to apply any Net Available Cash in accordance with this Section 4.09 except to the extent that the aggregate Net Available Cash from all Asset Dispositions which is not applied in accordance with this Section 4.09 exceeds $150.0 million. Pending application of Net Available Cash pursuant to this Section 4.09, such Net Available Cash

may be invested in Temporary Cash Investments, applied to temporarily reduce revolving credit indebtedness or used in any manner otherwise permitted by this Indenture.

For the purposes of clause (a)(2) of this Section 4.09, the following are deemed to be cash or cash equivalents: (1) the assumption of Indebtedness of the Company or any Wholly Owned Subsidiary (in each case other than (i) Indebtedness constituting Subordinated Obligations and (ii) Indebtedness owed to the Company or an Affiliate of the Company) and the release of the Company or such Restricted Subsidiary from all liability on such Indebtedness in connection with such Asset Disposition; and (2) securities received by the Company or any Restricted Subsidiary from the transferee that are promptly converted by the Company or such Restricted Subsidiary into cash.

(b)     In the event of an Asset Disposition that requires the purchase of Notes pursuant to Section 4.09(a)(3)(C), the Company shall make such Asset Disposition Offer to purchase Notes on or before the fifth Business Day following the 540th day after the Measurement Date, and shall purchase Notes tendered pursuant to an offer by the Company for the Notes at a purchase price of 100% of the principal amount thereof on the date of purchase without premium, plus accrued but unpaid interest in accordance with the procedures set forth in this Indenture and customary practice. If the aggregate purchase price of the Notes tendered exceeds the Net Available Cash allotted to their purchase, the Company shall select the Notes to be purchased on a pro rata basis but in denominations of $1,000 principal amount or multiples thereof. The Company shall not be required to make such an offer to purchase Notes pursuant to this Section 4.09 if the Net Available Cash available therefor is less than $150.0 million (which lesser amount shall be carried forward for purposes of determining whether such an offer is required with respect to the Net Available Cash from any subsequent Asset Disposition). Upon completion of any application of Net Available Cash in accordance with the foregoing provisions of clause (a) (3) of this Section 4.09, the amount of Net Available Cash shall be reset at zero.

(c)     The Company shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section 4.09. To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.10, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.09 by virtue of its compliance with such securities laws or regulations.

(d)     If, as of the date of any supplemental indenture, pursuant to which the parties seek to waive or modify the provisions of this Section 4.09 or any relevant definition, no Asset Disposition has occurred that would, with the passage of time and the absence of any contrary application of the Net Available Cash therefrom, give rise to the requirement to make an Asset Disposition Offer, the Company does not have a present intent to make any Asset Disposition that would give rise to such requirement, and the Company is not aware of any pending, proposed or threatened Asset Disposition that would give rise to such requirement, the provisions under this Indenture relative to the Company's obligation to make an offer to purchase the Notes as a result of an Asset Disposition may be waived or modified with the written consent of the holders of a majority in principal amount of the Notes.

SECTION 4.10.     Limitation on Affiliate Transactions.

(a)     The Company shall not, and shall not permit any Restricted Subsidiary to, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Company (an *"Affiliate Transaction"*) unless:

(1)     the terms of the Affiliate Transaction are no less favorable to the Company or such Restricted Subsidiary than those that could be obtained at the time of the Affiliate Transaction in arm's-length dealings with a Person who is not an Affiliate;

(2)     if such Affiliate Transaction involves an amount in excess of $50.0 million, the terms of the Affiliate Transaction are set forth in writing and a majority of the non-employee directors of the Company disinterested with respect to such Affiliate Transaction shall have determined in good faith that the criteria set forth in clause (1) of this Section 4.10 are satisfied and shall have approved the relevant Affiliate Transaction as evidenced by a resolution of the Board of Directors; and

(3)     if such Affiliate Transaction involves an amount in excess of $100.0 million, the Board of Directors shall also have received a written opinion from an Independent Qualified Party to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Company and its Restricted Subsidiaries or is not less favorable to the Company and its Restricted Subsidiaries than could reasonably be expected to be obtained at the time in an arm's-length transaction with a Person who was not an Affiliate.

(b)     The provisions of Section 4.10(a) shall not prohibit:

(1)     any Investment (other than a Permitted Investment but including Permitted Investments made under clause (12) of the definition thereof) or other Restricted Payment, in each case permitted to be made pursuant to Section 4.05;

(2)     any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors;

(3)     loans or advances to employees in the ordinary course of business, but in any event not to exceed $1.0 million in the aggregate outstanding at any one time;

(4)     the payment of reasonable fees and compensation (including health benefits, vacation, severance, compensation and similar benefits) to, and provision of customary indemnification on behalf of, directors, employees, consultants and agents of the Company or any Restricted Subsidiary as determined in good faith by the Board of Directors or the Company's senior management;

(5)     any transaction (i) between or among the Company and/or its Restricted Subsidiaries or (ii) between or among the Company, a Restricted Subsidiary or any other

Person that would constitute an Affiliate Transaction solely because the Company or a Restricted Subsidiary owns an equity interest in or otherwise controls such Person;

(6)     the issuance or sale of Capital Stock (other than Disqualified Stock) of the Company;

(7)     the payment of all fees and expenses related to the Transactions; and

(8)     any transaction between (i) the Company or any Restricted Subsidiary and (ii) any other Group Member entered into in good faith;

(9)     any transaction involving the construction, design, development, purchase or acquisition of a satellite and related assets of any Group Member;

(10)    any management agreement, tax sharing agreement and shared services agreement with any Group Member;

(11)    any transaction set forth on Schedule 4.10;

(12)    any transaction in which the Board of Directors has received a written opinion from an Independent Qualified Party to the effect that such Affiliate Transaction is fair from a financial standpoint, to the Company and its Restricted Subsidiaries or is not less favorable to the Company and its Restricted Subsidiaries than could reasonably be expected to be obtained at the time in an arm's length transaction with a Person who was not an Affiliate; or

(13)    any affiliate transaction in which deficiency, if any, of the fair market value of the consideration which would have been received by the Company or any Restricted Subsidiary in a transaction complying with Section 4.10(a)(1) over the consideration actually received by the Company and its Restricted Subsidiaries, as determined in good faith by the Board of Directors of the Company, is treated as a Restricted Payment or Permitted Investment and otherwise permitted under this Indentures.

For purposes of this Indenture, a director is not deemed to be interested in a transaction between or among Persons solely because such director is an officer or director of both Persons or their Affiliates.

SECTION 4.11.     Guarantors.

(a)     The Company will cause (1) each Domestic Subsidiary that is a Wholly Owned Subsidiary, (2) subject to receipt of all necessary consents contemplated by paragraph (b) of this Section, each Domestic Subsidiary that is not a Wholly Owned Subsidiary, and (3) each Domestic Subsidiary (not described in clauses (1) or (2) above) that Guarantees any Indebtedness of the Company or a Domestic Subsidiary, in each case, whether existing on the Issue Date or thereafter acquired or formed, to at all times be a Guarantor, and if such Subsidiary is not a party to the Indenture or a Supplemental Guaranty Agreement, to execute and deliver to the Trustee a Supplemental Guaranty Agreement pursuant to which such Subsidiary will

Guarantee payment of the Notes on the same terms and conditions as those set forth in this Indenture. Notwithstanding any provision of this Indenture, the Notes or any Collateral Document to the contrary, no Unrestricted Subsidiary shall be required to become a Guarantor or grant a Lien on any of its assets or otherwise be bound by the provisions of this Indenture, the Notes or any Collateral Document.

(b)     In the case of a Domestic Subsidiary that is not a Wholly Owned Subsidiary, if such Subsidiary is not permitted to Guarantee the Notes, the Company shall, and shall cause its Subsidiaries (including such Subsidiary) to, use Commercially Reasonable Efforts to obtain any and all consents necessary in order to authorize and allow such Subsidiary to make such Guarantee.

(c)     The Guaranty of a Guarantor shall be released as provided in Section 10.06.

SECTION 4.12.     Limitation on the Issuance and Sale of Capital Stock of Restricted Subsidiaries. The Company will not sell, and will not permit any Restricted Subsidiary, directly or indirectly, to issue or sell, any shares of Capital Stock of a Restricted Subsidiary except:

(1)     to the Company or a Wholly Owned Subsidiary;

(2)     issuances of Foreign Required Minority Shares but only to the extent required by applicable law and only if the Company, by contract or otherwise, controls the management and business of such Foreign Subsidiary and derives the economic benefits of ownership of such Foreign Subsidiary to substantially the same extent as if such Foreign Subsidiary were a Wholly Owned Subsidiary;

(3)     if, immediately after giving effect to such issuance or sale, such Restricted Subsidiary would no longer constitute a Restricted Subsidiary, provided that any Investment in such Person remaining after giving effect to such issuance or sale shall constitute an "Investment" made at the time of such issuance or sale, and such issuance or sale shall only be permitted if such Investment is permitted to be made under Section 4.05; and

(4)     Issuances of Capital Stock (other than Preferred Stock) of any Restricted Subsidiary, the Net Cash Proceeds of which are promptly applied pursuant to Section 4.09(a)(3); provided that at no time may a Restricted Subsidiary the Capital Stock of which has been issued pursuant to this clause (4) be the owner of a satellite.

SECTION 4.13.     Limitation on Sale/Leaseback Transactions. The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into any Sale/Leaseback Transaction unless such transaction is otherwise permitted under this Indenture, including Sections 4.06, 4.07 and 4.09.

SECTION 4.14.     Existence. Subject to Articles 4 and 5 of this Indenture, the Company will do or cause to be done all things necessary to preserve and maintain in full force and effect its existence and the existence of each Restricted Subsidiary in accordance with the

respective organizational documents of the Company and each such Restricted Subsidiary and the rights (whether pursuant to charter, partnership certificate, agreement, statute or otherwise), licenses and franchises of the Company and each such Restricted Subsidiary, provided that the Company shall not be required to preserve any such right, license or franchise, or maintain the existence of any entity (other than of the Company) if the preservation or maintenance thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole, and the failure to preserve or maintain such right, license, franchise or entity is not reasonably likely to have a material adverse effect on the ability of the Company to repay the principal of, premium, if any, and interest on the Notes.

SECTION 4.15.    Payment of Taxes and Other Claims.  The Company will pay or discharge and shall cause each Restricted Subsidiary to pay or discharge, or cause to be paid or discharged, before the same shall become delinquent (i) all material taxes, assessments and governmental charges levied or imposed upon (a) the Company or any such Restricted Subsidiary, (b) the income or profits of any such Restricted Subsidiary which is a corporation or (c) the property of the Company or any such Restricted Subsidiary and (ii) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon the property of the Company or any such Restricted Subsidiary, provided that the Company shall not be required to pay or discharge, or cause to be paid or discharged, any such tax, assessment, charge or claim if either (i) the amount, applicability or validity of which is being contested in good faith by appropriate proceedings by the Company and its Restricted Subsidiaries where the failure to effect such payment is not adverse in any material respect to the Holders and for which adequate reserves (to the extent required in accordance with GAAP) have been established and maintained or (ii) the failure to pay or discharge the same is not reasonably likely to have a material adverse effect on the ability of the Company to repay the principal of, premium, if any, and interest on the Notes.

SECTION 4.16.    Insurance; Maintenance of Properties.

(a)    The Company and each of its Subsidiaries shall provide or cause to be provided, for itself and each of their respective Subsidiaries, insurance (including appropriate self-insurance) that is adequate and appropriate, in the good faith judgment of the Board of Directors of the Company, for the conduct of the business of the Company and such Subsidiaries in a prudent manner.

(b)    The Company shall cause all properties owned by the Company or any Subsidiary or used or held for use in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and will cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of the Board of Directors of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing in this Section 4.16 shall prevent the Company from discontinuing the maintenance of any such properties if the Board of Directors of the Company reasonably determines in good faith that such discontinuance is not reasonably likely to have a material adverse effect on the ability of the Company to repay the principal of, premium, if any, and interest on the Notes.

SECTION 4.17.     Notice of Defaults.  In the event that the Company or any Subsidiary Guarantor becomes aware of any Event of Default, the Company shall promptly thereafter deliver to the Trustee an Officers' Certificate specifying such Event of Default and what actions the Company is taking or proposes to take with respect thereto.

SECTION 4.18.     Business Activities.  The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any material business operations in businesses other than Related Businesses.

SECTION 4.19.     Use of Proceeds.  The Company will use the proceeds of the issuance of the Notes only as permitted under the Plan.

SECTION 4.20.     Further Instruments and Acts.  Upon request of the Trustee or the Collateral Agent, the Company will, and will cause its Subsidiaries to, execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

## ARTICLE 5

### Merger

SECTION 5.01.     Merger and Consolidation.

(a)     The Company shall not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

(1)     the resulting, surviving or transferee Person (the *"Successor Company"*) shall be a corporation organized and existing under the laws of the United States of America, any State thereof or the District of Columbia and the Successor Company (if not the Company) shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, all the obligations of the Company under the Notes, this Indenture and the Collateral Documents;

(2)     immediately after giving pro forma effect to such transaction (and treating any Indebtedness of the Successor Company and its Subsidiaries as having been Incurred by the Successor Company or each such Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(3)     immediately after giving pro forma effect to such transaction, the Successor Company would be able to Incur an additional $1.00 of Indebtedness pursuant to Section 4.06(a);

(4)     each Person that is required pursuant to the terms of this Indenture to be a Guarantor (i) shall have become a Guarantor pursuant to a Supplemental Guaranty Agreement or (ii) shall have confirmed its Guaranty pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee;