# EXHIBIT 16

## EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of _____ 2005, by and between Loral Space & Communications Inc., a Delaware corporation (the "*Company*"), and [*Name of Executive*], a resident of [*City and State*] (the "*Executive*").

**WHEREAS**, the Company desires to engage the services of the Executive and the Executive desires to be employed by the Company on the terms and conditions hereinafter set forth; and

**WHEREAS**, the Company desires to be assured that all proprietary and confidential information of the Company will be preserved for the exclusive benefit of the Company;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive agree as follows:

Section 1.    <u>Employment and Position</u>.  The Company hereby employs the Executive as its [*Title of Executive's Position*], and the Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

Section 2.    <u>Term</u>.  The term of employment under this Agreement shall begin on the Effective Date, as such term is defined in the Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 3, 2005, of Loral Space & Communications Ltd., et al (the "*Plan of Reorganization*"), and, unless sooner terminated as provided in Section 6, shall conclude on the second (2nd) anniversary of the Effective Date (the "*Term*").  At the Executive's request within the last six months preceding the expiration of the Term, the Company shall, to the extent practicable within two weeks after any such request but without any obligation, provide the Executive with notice regarding whether the Company intends to renew or extend the Term under this Agreement, terminate the employment relationship between the parties on or shortly after the expiration of the Term or continue the Executive's employment on an "at will" basis with no guaranteed term.  Unless the Executive's employment with the Company is terminated upon the expiration of the Term or the Term under this Agreement is renewed or extended, the Executive shall be employed by the Company after the Term on an "*at will*" basis.

Section 3.    <u>Duties</u>.  The Executive shall perform services in a managerial capacity in a manner consistent with the Executive's position as [*Title of Executive's Position*], subject to the general supervision of the Chief Executive Officer of the Company.  The Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company for the Term, provided, however, that Executive shall be permitted to engage in (i) other activities of a civic, religious, political or charitable

nature, (ii) managing investments of the Executive and the Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) corporate directorships and other business activities described in Schedule I attached hereto, or (iv) such other activities as may hereafter be specifically approved in writing, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder, provided, further, however, that Executive may not engage in any such activities that would result in the Executive being in Competition (as defined in Section 8(d) below).

Section 4.     Compensation.

(a)     Salary.  In consideration of the services rendered by the Executive under this Agreement, the Company shall pay the Executive a base salary (the "*Base Salary*") at the rate of [*$Salary*] per calendar year.   The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions. The Board of Directors (the "Board") of the Company may review from time to time the Base Salary payable to Executive hereunder and may, in its sole discretion, increase but not decrease, the Executive's salary rate.  Any such increased salary shall be and become the "*Base Salary*" for purposes of this Agreement.

(b)     Annual Bonus.  The Company shall maintain an annual Management Incentive Bonus program ("*MIB Program*") for corporate office executives,[1] and Executive shall be a participant in the MIB Program and shall be entitled to an annual bonus to the extent payable, under such program ("*Annual Bonus*").  The Executive's target annual bonus opportunity under the MIB Program shall be         percent (      %) of the Executive's Base Salary (the "*Target Annual Bonus*").  The Annual Bonus for the 2005 fiscal year under the MIB Program shall be earned and determined in accordance with the terms and conditions heretofore established by the Compensation Committee of the Board of Directors of Loral Space & Communications Ltd..  With respect to the Annual Bonus for the 2006 fiscal year or any subsequent fiscal year, the Board shall, in its discretion, establish the terms and conditions of the MIB Program and may amend the MIB Program accordingly.  The Annual Bonus shall be paid on or before March 15 of the year following the year to which the Annual Bonus relates.

(c)     Stock Options.  The Company agrees to grant to the Executive an option to purchase _____ shares of common stock (the "Stock") of the Company (the "Option") pursuant to the terms of the Company's 2005 Stock Incentive Plan (the "Plan").  Except as set forth below, the Option shall have a per share exercise price equal to $17.48[2] (the "Exercise Price").  Such Option shall be granted on or about the thirtieth

---

[1] Two executives at SSL participate in a different annual bonus plan.

[2] Assuming a numerator of $700 million, reduced by $200 million of preferred stock and $126 million of notes, and increased for excess cash, and a denominator of 21,390,374 shares are issued under the Plan of Reorganization (including the stock underlying all

(30th) day following the Effective Date (the "Grant Date"). The Option shall have such other terms and conditions as set forth in the Option Agreement attached hereto as Exhibit A (the "Option Agreement"). The Company acknowledges that Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), places certain restrictions on stock options that have a per share exercise price less than the fair market value of a share of the underlying stock at the time of grant. The Company also acknowledges that the Exercise Price may be less than the fair market value of a share of Stock on the Grant Date (the "Grant Date Value"). For purposes of this Section 4(c), the Grant Date Value shall be the Fair Market Value (as defined in the Plan) on the Grant Date. If the Exercise Price is less than the Grant Date Value, the Company shall (i) grant the Option with an exercise price equal to the Grant Date Value rather than the Exercise Price and (ii) enter into the Deferred Compensation Arrangement outlined below.

(d)     <u>Deferred Compensation Arrangement</u>. If the Exercise Price is less than the Grant Date Value, the Company shall establish a deferred compensation bookkeeping account for the Executive (the "Deferred Compensation Account"). As of the Grant Date, the Company shall credit to the Deferred Compensation Account a dollar amount equal to (A) the difference between the Exercise Price and the Grant Date Value, multiplied by (B) the number of shares of Stock subject to the Option. The Deferred Compensation Account shall become vested in the same proportion as the Option vests and becomes exercisable (e.g. 25% per year over four years), including any accelerated vesting upon termination of the Executive's employment by the Company without Cause (as defined in the Option Agreement) or termination by the Executive for Good Reason (as defined in the Option Agreement) or upon a Change in Control (as defined in the Plan).

(i)     The vested portion of the Deferred Compensation Account shall be distributed to the Executive upon the earlier to occur of (i) a termination of the Executive's employment with the Company, (ii) the occurrence of a Change in Control (as defined in the Plan) and (iii) the date which is the seventh anniversary of the Grant Date; provided, however, that in the event the Executive is determined to be a "specified person," as defined in Section 409A(a)(2)(B), as of the date of the Executive's termination of employment, any distribution of the Deferred Compensation Account scheduled to be made upon such termination shall be delayed for six months or such other period as required to comply with Section 409A(a)(2)(B).

(ii)     The unvested portion of the Deferred Compensation Account shall be subject to forfeiture upon termination of the Executive's employment with the Company prior to vesting to the same extent as the unvested portion of the Option is subject to forfeiture.

---

options under the Plan).

(iii)    Except as provided below, the value of the Deferred Compensation Account shall not be credited with interest or be subject to any rate of return. Upon any exercise of all or a portion of the Option, the corresponding portion of the Deferred Compensation Account shall automatically be converted into an interest-bearing account from the date of such exercise through the date of distribution.  For example, if the Option is exercised with respect to 50% of the shares underlying the Option, 50% of the Deferred Compensation Account shall be converted into an interest-bearing account.  Once converted, the amounts credited to this interest-bearing Deferred Compensation Account shall receive a rate of return equal to the highest rate of return then available to the Company in an interest-bearing account.  To the extent possible, the Company will seek to avoid or, if not avoidable, to minimize any administrative expense incurred in maintaining the interest-bearing Deferred Compensation Account.  However, the rate of return on the interest-bearing Deferred Compensation Account shall be reduced, but not below the principal amount, by any administrative expense incurred by the Company in maintaining the interest-bearing Deferred Compensation Account.

(iv)    While all or a portion of the Option remains unexercised and outstanding, the corresponding portion of the Deferred Compensation Account shall be linked to the value of the Stock as follows.  To the extent the value of the Stock declines to a level between the Grant Date Value and the Exercise Price (the "Spread Value Zone"), the corresponding portion of the Deferred Compensation Account shall also decline in the same percentage as the Stock declines as measured against the Exercise Price and the value of the corresponding portion of the Deferred Compensation Account shall track the percentage increase or decrease in the value of the Stock while its value remains in the Spread Value Zone such that if the value of the Stock declines to the value of the Exercise Price or below, the value of the corresponding portion of the Deferred Compensation Account shall decline to zero and if the value of the Stock rebounds to the Grant Date Value, the corresponding portion of the Deferred Compensation Account shall regain its proportional full value.  To the extent the Stock rises above the Grant Date Value the corresponding portion of the Deferred Compensation Account shall not rise above its proportional full value.

(iv)    The amounts credited to the Deferred Compensation Account will be subject to all applicable legally required tax withholding as determined by the Company, unless such determination is unreasonable.

(v)    It is intended that the tandem Option/Deferred Compensation Account arrangement be structured so as to avoid and tax under Section 409A(a)(B).  To the extent that the Executive has reason to believe that the Deferred Compensation Account will subject the Executive to a tax under Section 409A(a)(B), the Executive may request that the tandem Option/Deferred Compensation Account arrangement be restructured to avoid any such tax.  To the

extent the Executive requests any such restructuring, the Company agrees to enter into good faith negotiations with the Executive to accommodate such restructuring to the extent possible so as to avoid any such tax.

(vi) In no event shall the tandem Option/Deferred Compensation Account and any restructuring thereof result in the Company incurring any cost or expense to a greater extent than the Company would have incurred had the Option been granted at the Exercise Price.

Section 5.     Benefits.  In addition to the compensation detailed in Section 4 of this Agreement, the Executive shall be entitled to the following additional benefits:

(a)     Paid Vacation.  The Executive shall be entitled to (__) days paid vacation per calendar year in accordance with the Company's vacation policy in effect from time to time, such vacation shall extend for such periods and shall be taken at such intervals as shall be appropriate and consistent with the proper performance of the Executive's duties hereunder.

(b)     Welfare Plans.  During the Term, the Executive and/or the Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, salary continuance, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time).  Such plans, programs, practices and policies are subject to change from time to time by the Company.

(c)     Other Benefit Plans.  During the Term, the Executive shall be entitled to participate in all savings, retirement and pension plans (including the Company's Supplemental Executive Retirement Plan), programs, practices and policies applicable generally to similarly situated executives of the Company as determined by the Board from time to time.  Such plans, programs, practices and policies are subject to change from time to time by the Company.

(d)     Perquisites and Other Benefits.  During the Term, the Executive shall be entitled to such additional perquisites and fringe benefits appertaining to his position in accordance with any practice established by the Board.  During the Term, Executive shall be entitled to receive all benefits under any individual welfare benefit arrangements (including life insurance coverage) or other benefit arrangements currently in effect for such Executive in a manner consistent with past practice, and such arrangements are listed on Schedule I attached hereto.

(e)     Reimbursement of Expenses.  The Company shall reimburse the Executive for all reasonable and necessary expenses actually incurred by the Executive directly in connection with the business affairs of the Company and the performance of his duties hereunder, upon presentation of proper receipts or other proof of expenditure and subject

to such reasonable guidelines or limitations provided by the Company from time to time. The Executive shall comply with such reasonable limitations and reporting requirements with respect to such expenses as the Board may establish from time to time.

(f)     Indemnification.    In addition to indemnification obligations of the Company pursuant to Section 8.7 of the Company's Plan of Reorganization and the terms of any officers' liability insurance carried by the Company, to the fullest extent permitted by law and the Certificate of Incorporation of the Company, the Executive (and his heirs, executors and administrators) shall be indemnified by the Company and its successors and assigns for all liabilities, costs and expenses (including reasonable attorneys' fees) arising from or relating to his position or his employment with the Company or any of its subsidiaries or affiliates. To the fullest extent permitted by law and the Certificate of Incorporation of the Company, the Company and its successors and assigns shall advance the reasonable cost of defending any claim or legal action against the Executives, including reasonable attorneys fees and expenses. In addition, the Executive shall be an insured person under or otherwise covered by directors and officers liability insurance in an amount consistent with past practice. The obligations of the Company pursuant to this Section shall survive the expiration of the Term or Executive's voluntary or involuntary termination or resignation for Good Reason. In addition, the Company and Executive are entering a separate Indemnification Agreement substantially in the form attached as Exhibit C.

Section 6.    Termination.    This Agreement shall terminate at the end of the Term or earlier as follows:

(a)     Death.    The employment of the Executive shall automatically terminate upon the death of the Executive.

(b)     Disability.    In the event of any physical or mental disability of the Executive rendering the Executive substantially unable to perform his duties hereunder for a period of at least 120 days out of any twelve-month period and the further determination that the disability is permanent with regard to the Executive's ability to return to work in his full capacity, the Executive's employment shall be terminated on account of the Executive's disability. Any determination of permanent disability shall be made by the Board in consultation with a qualified physician or physicians selected by the Board and reasonably acceptable to the Executive. The failure of the Executive to submit to a reasonable examination by such physician or physicians shall act as an estoppel to any objection by the Executive to the determination of disability by the Board.

(c)     By the Company For Cause.    The employment of the Executive may be terminated by the Company for Cause (as defined below) at any time effective upon written notice to the Executive; provided, however, that if such termination is based upon any event set forth in clauses (iii), (iv), (v) or (vi) below, Executive shall be given not less than ten (10) days written notice by the Board of the intention to terminate him for Cause, such notice to state in detail the particular act or acts or failure or failures to act that

constitute the grounds on which the proposed termination for Cause is based, and Executive shall have ten (10) days after the date that such written notice has been given to Executive in which to address the Board regarding any such alleged act or failure to act. If the Board makes a determination that Cause exists, the termination shall be effective on the date immediately following the expiration of the ten (10) day notice period. For purposes hereof, the term "*Cause*" shall mean that the Board has determined reasonably, in good faith and based on credible evidence that one or more of the following has occurred:

> (i)     the Executive shall have been after the Effective Date convicted of, or shall have pleaded guilty or nolo contendere to, any felony or any other crime that would have constituted a felony under the laws of the State of New York;

> (ii)    the Executive shall have been indicted for any felony or any other crime that would have constituted a felony under the laws of the State of New York in connection with or arising from the Executive's employment with the Company;

> (iii)   the Executive shall have breached any material provision of Section 8 hereof;

> (iv)    the Executive shall have committed any fraud, embezzlement, misappropriation of funds, or breach of fiduciary duty against the Company, in each case of a material nature;

> (v)     the Executive shall have engaged in any willful misconduct resulting in or reasonably likely to result in a material loss to the Company or substantial damage to its reputation; or

> (vi)    the Executive willfully breaches in any material respect any material provision of the Company's Code of Conduct and, to the extent any such breach is curable, the Executive has failed to cure such breach within ten (10) days after written notice of the alleged breach is provided to the Executive.

(d)     <u>By the Company without Cause</u>.    The Company may terminate the Executive's employment at any time without Cause effective upon written notice to the Executive.

(e)     <u>By the Executive Voluntarily</u>.    The Executive may terminate his employment at any time effective upon at least thirty (30) days prior written notice to the Company.

(f)     <u>By the Executive for Good Reason</u>.    The Executive may terminate his employment for Good Reason by providing the Company thirty (30) days' written notice setting forth in reasonable specificity the event that constitutes Good Reason, within sixty (60) days of the occurrence of such event. During such thirty (30) day notice period, the

Company shall have a cure right (if curable), and, if not cured within such period, Executive's termination will be effective upon the expiration of such cure period. For this purpose, the term "*Good Reason*" shall mean:

(i) the assignment to the Executive of any duties inconsistent in any substantial respect with the Executive's position, authority or responsibilities or any duties which are illegal or unethical or any diminution of any of the Executive's significant duties;

(ii) any reduction in Base Salary, the Target Annual Bonus or any of the benefits described in Section 5 of this Agreement to the extent not permitted under Section 5;

(iii) the relocation by the Company of the Executive's primary place of employment with the Company to a location not within a fifty (50) mile radius of such place of employment as of the Effective Date; provided, however, that such relocation shall not be considered Good Reason if such location is closer to the Executive's home than the Executive's primary place of employment as of the Effective Date;

(iv) other material breach of this Agreement by the Company; or

(v) the failure of the Company to obtain the assumption in writing of its obligation to perform this Agreement by any successor to all or substantially all of the assets of the Company.

Section 7.    Termination Payments and Benefits.

(a)    Voluntary Termination, Termination For Cause. Upon any termination of employment during the Term either (i) by the Executive without Good Reason under Section 6(e), or (ii) by the Company for Cause as provided in Section 6(c), all payments, salary and other benefits hereunder shall cease at the effective date of termination. Notwithstanding the foregoing, the Executive shall be entitled to receive from the Company (i) all salary earned or accrued through the date the Executive's employment is terminated, (ii) reimbursement for any and all monies advanced in connection with the Executive's employment for reasonable and necessary business expenses incurred by the Executive through the date the Executive's employment is terminated, (iii) all other payments and benefits to which the Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including any earned and accrued, but unused vacation pay but excluding any entitlement to severance under any Company severance policy generally applicable to the Company's salaried employees, and (iv) excluding any accrued and unpaid Annual Bonus for the immediately preceding year (collectively, "*Accrued Benefits*").

(b)    Death. In the event of a termination due to the Executive's death during the Term, the Company shall have no further obligations to the Executive or his

beneficiaries other than to pay to the Executive's designated beneficiary or, if no beneficiary has been designated by the Executive, to his estate (i) all Accrued Benefits, plus (ii) any Base Salary through the end of the calendar month in which the Executive's death occurred, plus (iii) any accrued and unpaid Annual Bonus for the immediately preceding year, and (iv) at the times the Company pays its executives bonuses in accordance with its general payroll policies, an amount equal to that portion of the Annual Bonus which but for the Executive's death would have been earned by the Executive during the year of his death, pro rated based on a formula, the denominator of which shall be 365 and the numerator of which shall be the number of days during the year of his death during which the Executive was employed by the Company on an active status (the Accrued Benefits and the payment of the Annual Bonus are collectively referred to as "Enhanced Accrued Benefits"). In addition, any unvested stock options under the Plan that would have become vested on the next date of vesting applicable thereto shall become vested as to a portion thereof based on a formula, the denominator of which shall be 365 and the numerator of which shall be the number of days during the year of his death during which the Executive was employed by the Company on an active status. The Executive's medical, prescription and dental coverage shall continue for the benefit of the Executive's family members through the end of the Term.

(c)     Termination without Cause or for Good Reason. In the event that the Executive's employment is terminated during the Term by the Company without Cause or by the Executive for Good Reason, the Executive shall be entitled to receive as his exclusive right and remedy in respect of such termination, (i) all Enhanced Accrued Benefits, (ii) severance pay equal to the greater of (A) the amount set forth on Schedule II hereto [KERP Amount], or (B) the remaining amount of Base Salary the Executive would have received had the Executive been employed through the end of the Term ("Severance Payments"), with such Severance Payments to be paid in a lump sum as soon as practicable on or after termination (but not later than three business days after the release described in Section 7(g) becomes effective and not revocable). In addition, all unvested stock options under the Plan shall become fully vested and remain exercisable as provided under the terms of the applicable plan and related agreement, and the Executive shall continue to be covered, upon the same terms and conditions applicable generally to similarly situated executives who remain employed with the Company, by the same or equivalent medical, dental and life insurance coverage as in effect for the Executive immediately prior to the termination of his employment, until the earlier of (A) the expiration of the period for which he receives severance pay pursuant to clause (iii) above (determined by dividing the amount of such severance by the Executive's monthly salary rate in effect on his date of termination) or (B) the date the Executive has commenced new employment and has thereby become eligible for comparable benefits, subject to the Executive's rights under COBRA. For avoidance of doubt, if the Executive is offered employment consistent with the terms of this Agreement with the person that acquires all or substantially all of the assets or stock of New FSS or New SSL (as such terms are defined in the Plan of Reorganization), any affiliate that directly or indirectly owns such acquirer, or any successor to the acquirer or any such affiliate and such person assumes this Agreement, the Executive shall not be treated as having a termination of employment

without Cause or for Good Reason, regardless of whether the Executive refuses the offer of employment, by reason of the sale of such assets or stock.

(d)    Termination due to Disability.    In the event that the Executive's employment is terminated during the Term due to the Disability of the Executive, the Company shall have no further obligation to the Executive other than to pay the Executive (in addition to any disability insurance payments to which the Executive is entitled pursuant to Section 5 above) all Enhanced Accrued Benefits. In addition, any unvested stock options under the Plan that would have become vested on the next date of vesting applicable thereto shall become vested as to a portion thereof based on a formula, the denominator of which shall be 365 and the numerator of which shall be the number of days during the year of his Disability during which the Executive was employed by the Company on an active status.

(e)    No Other Benefits. Except as specifically provided in this Section 7, the Executive shall not be entitled to any other compensation, severance or other benefits from the Company or any of its subsidiaries or affiliates upon the termination of this Agreement or the Executive's employment for any reason whatsoever. Payment by the Company of all Accrued Benefits, Enhanced Accrued Benefits and Severance Payments (if applicable) and contributions to the cost of the Executive's confirmed participation in the Company's group health and dental plans that may be due to the Executive under the applicable termination provision of this Section 7 shall constitute the entire obligation of the Company to the Executive.

(f)    Condition. The Company will not be required to make the payment and provide the benefits stated in this Section 7 unless the Executive executes and delivers to the Company a waiver and release agreement in the form attached hereto as Exhibit B and such waiver and release is not unilaterally revocable by the Executive.

Section 8.    Restrictive Covenants.

(a)    Proprietary Information.    In the course of service to the Company, the Executive will have access to confidential specifications, know-how, strategic or technical data, marketing research data, product research and development data, manufacturing techniques, confidential customer lists, sources of supply and trade secrets, all of which are confidential and may be proprietary and are owned or used by the Company, or any of its subsidiaries or affiliates. Such information shall hereinafter be called *"Proprietary Information"* and shall include any and all items enumerated in the preceding sentence and coming within the scope of the business of the Company or any of its subsidiaries or affiliates as to which the Executive may have access, whether conceived or developed by others or by the Executive alone or with others during the Executive's period of service with the Company, whether or not conceived or developed during regular working hours. Proprietary Information shall not include any records, data or information which are in the public domain during Executive's service with the Company or after the Executive's service with the Company has terminated, *provided* the

same are not in the public domain as a consequence of disclosure by the Executive in violation of this Agreement.

(b) <u>Non-Use and Non-Disclosure</u>. The Executive shall not during the Term or at any time thereafter (i) disclose any Proprietary Information to any person other than (A) the Company, (B) the Company's or its affiliates' directors, officers or employees who, in the reasonable judgment of the Executive, need to know such Proprietary Information, (C) such other persons to whom the Executive has been specifically instructed to make disclosure by the Board; and in all such cases only to the extent required in the course of the Executive's service to the Company or (D) as required by law, or (ii) use any Proprietary Information, directly or indirectly, for his own benefit or for the benefit of any other person or entity.

(c) <u>Return of Documents</u>. All notes, letters, documents, records, tapes and other media of every kind and description containing Proprietary Information and any copies, in whole or in part, thereof (collectively, the "*Documents*"), whether or not prepared by the Executive, shall be the sole and exclusive property of the Company. The Executive shall safeguard all Documents and shall surrender to the Company at the time his employment terminates, or at such other time or times as the Board or its designee may specify, all Documents then in the Executive's possession or control.

(d) <u>Non-Competition</u>. At all times during the Executive's employment with the Company or any affiliate during the Term, and for a period of twelve (12) months following the termination of employment during the Term with the Company or any affiliate for any reason (the "Restricted Period"), the Executive will not engage in Competition (as defined below) with the Company. For purposes of this Agreement, "Competition" shall mean engaging in, or otherwise directly or indirectly being employed by, or acting as a consultant or adviser (paid or unpaid) to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, [As Applicable to the Executive] (i) the satellite manufacturing business (but not any other business) of Boeing, Lockheed, Alcatel Space or Astrium, (ii) the fixed satellite services business (but not any other business) of PanAmSat, SES Astra, Intelsat, New Skies Satellites, (iii) any business similar to the businesses described in clause (i) or (ii) above that competes with the services provided by the Company, or (iv) any business that competes with a business that the Company engages in or is preparing to engage in as of the date of the Executive's termination of employment with the Company, as described or otherwise contemplated in the Company's business plan for the year of such termination of employment, and with respect to which the Executive performed significant services, and any transferee of or successor to any of the foregoing businesses. Notwithstanding anything to the contrary in this Agreement, the Executive may, directly or indirectly, own, solely as an investment, securities of a business enterprise in Competition with the Company or its subsidiaries which are publicly traded on a national or regional stock exchange or on the over-the-counter market if the Executive (i) is not a controlling person of or a member of a group which controls such business enterprise and (ii) does not, directly or indirectly, own five percent (5%) or more of any class of securities of such business enterprise.

(e)     Non-Solicitation of Employees.  At all times during the Restricted Period, the Executive will not directly or indirectly solicit or in any manner encourage employees of the Company or any affiliate who were employed by the Company within the six-month period prior to the termination of the Executive's employment with the Company or any affiliate to leave its employ and will not offer or cause to be offered employment to any such person; provided, however, that the restrictions in this paragraph shall not apply to (i) general solicitations that are not specifically directed to employees of the Company or any affiliate and (ii) any administrative support staff.

(f)     Non-Solicitation of Customers or Suppliers.  At all times during the Restricted Period, the Executive will not knowingly solicit or in any manner encourage, directly or indirectly, customers of or suppliers to the Company or any affiliate who were customers of or suppliers to the Company or any affiliate within the twelve-month period prior to the termination of the Executive's employment with the Company or any affiliate to terminate or diminish their relationship with the Company or any affiliate.

(g)     Reasonableness.  The Executive has carefully considered the nature, extent and duration of the restrictions and obligations contained in this Agreement, including, without limitation, provisions of this Section 8 and acknowledges and agrees that such restrictions are fair and reasonable in all respects to protect the legitimate interests of the Company and its affiliates and that these restrictions are designed for the reasonable protection of the business of the Company and that of its affiliates.

(h)     Remedies.  The Executive recognizes that any breach of this Section 8 shall cause irreparable injury to the Company or its affiliates, inadequately compensable in monetary damages.  Accordingly, in addition to any other legal or equitable remedies that may be available to the Company, Executive agrees that the Company or its affiliates shall be able to seek and obtain injunctive relief in the form of a temporary restraining order, preliminary injunction, or permanent injunction against the Executive to enforce this Agreement.  To the extent that any damages are calculable resulting from the breach of this Agreement, the Company and its affiliates shall also be entitled to recover damages.  Any recovery of damages by the Company and its affiliates shall be in addition to and not in lieu of the injunctive relief to which the Company and its affiliates are entitled.  Without limiting the rights of the Company and its affiliates under this Section 8 or any other remedies that may be available to them, if a court of competent jurisdiction determines that the Executive has breached any of the provisions of this Section 8, the Company or its affiliates will have the right to cease making any payments or providing any benefits otherwise due to Executive under the terms and conditions of this Agreement, and the right to recover the Annual Bonus that may have been paid as part of the Enhanced Accrued Benefits and the Severance Payment that the Executive may have received under this Agreement.

Section 9.     Severable Provisions.  The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision.  In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole

or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

Section 10.    Notices.  All notices hereunder, to be effective, shall be in writing and shall be delivered by hand or mailed by certified mail, postage and fees prepaid, as follows:

| | |
|---|---|
| If to the Company: | Loral Space & Communications Inc.<br>600 Third Avenue<br>New York, New York 10016<br>Attention:  General Counsel |
| With a copy to: | [          ] |
| If to the Executive: | [*Executive*]<br>[*Address*]<br>[*Address*] |
| With a copy to: | [          ] |

or to such other address as a party may notify the other pursuant to a notice given in accordance with this Section 10.  All notices to any person shall be deemed given when actually received by the person.

Section 11.    Miscellaneous.

(a)    Amendment.  This Agreement may not be amended or revised except by a writing signed by the parties.

(b)    Assignment and Transfer.  The provisions of this Agreement shall be binding on and shall inure to the benefit of any such successor in interest to the Company.  Neither this Agreement nor any of the rights, duties or obligations of the Executive shall be assignable by the Executive, nor shall any of the payments required or permitted to be made to the Executive by this Agreement be encumbered, transferred or in any way anticipated, except as required by applicable laws.  This Agreement shall not be terminated solely by reason of the merger or consolidation of the Company with any corporate or other entity or by the transfer of all or substantially all of the assets of the Company to any other person, corporation, firm or entity.  However, all rights of the Executive under this Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, estates, executors, administrators, heirs and beneficiaries.  All amounts payable to the Executive hereunder shall be paid, in the event of the Executive's death, to the Executive's estate, heirs or representatives.

(c)     Withholding.   The Company shall be entitled to withhold from any amounts to be paid or benefits provided to the Executive hereunder any federal, state, local, or foreign withholding or other taxes or charges which it is from time to time required to withhold.  The Company shall be entitled to rely on an opinion of counsel if any question as to the amount or requirement of any such withholding shall arise.

(d)     Waiver of Breach.  A waiver by the Company or the Executive of any breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any other or subsequent breach by the other party.

(e)     Survival of Certain Provisions. Provisions of this Agreement shall survive any termination of employment if so provided herein or if necessary or desirable fully to accomplish the purposes of such provision, including, without limitation, the obligations of the Executive under Section 8 hereof.

(f)     Attorney's Fees.  In the event that any action is brought to enforce any of the provisions of this Agreement, or to obtain money damages for the breach thereof, all expenses (including reasonable attorneys' fees) shall be paid by the party incurring such fees or expenses; provided, however, that the Company shall reimburse Executive for such fees and expenses to the extent that the Executive prevails on any issues raised in such action.

(g)     Entire Agreement.  This Agreement, and the Executive's stock option award agreements under the Plan and Indemnification Agreement referred to in Section 5 hereof, constitutes the entire understanding of the parties with respect to the subject matter hereof and supercedes all prior negotiations, understandings, discussions, and agreements, whether written or oral, between them.

(h)     Captions.  Captions herein have been inserted solely for convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement.

(i)     Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and shall have the same effect as if the signatures hereto and thereto were on the same instrument.

(j)     Governing Law.  This Agreement shall be construed under and enforced in accordance with the laws of the State of New York.

(k)     Jurisdiction and Choice of Forum.  The Executive and the Company irrevocably submit for any disputes arising under or in connection with this Agreement to the exclusive jurisdiction of any state or federal court located in the State of New York. Both the Executive and the Company (i) acknowledge that the forum stated in this Section has a reasonable relation to this Agreement and to the relationship between the Executive and the Company, (ii) waive, to the extent permitted by law, any objection to personal jurisdiction or the laying of venue of any action or proceeding in the forum

stated in this section, (iii) agree not to commence any such action or proceeding in any forum other than the forum stated in this section and (iv) agree that, to the extent permitted by law, a final and non-appealable judgment in any such action or proceeding in any such court will be conclusive and binding on the Executive and the Company. However, nothing in this Agreement precludes the Executive or the Company from bringing any action or proceeding in any court for the purposes of enforcing the provisions of this section.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

LORAL SPACE & COMMUNICATIONS INC.

By:_____

Name:
Title:

_____

[*Name of Executive*]

Outside Business Relationships

Perquisites and Individual Benefits

Section 7(c)(iii)(A) Severance Amount

Exhibit A
Option Agreement

NON-QUALIFIED
STOCK OPTION AGREEMENT

UNDER

LORAL SPACE & COMMUNICATIONS INC.
2005 STOCK INCENTIVE PLAN

THIS AGREEMENT, made as of this [___] day of [_____], 2005 (the "Grant Date"), by and between Loral Space & Communications Inc., a Delaware corporation (the "Company"), and _____ (the "Optionee").

WHEREAS, the Optionee is employed by the Company or an Affiliate in a key capacity, and the Company desires to have Optionee remain in such employment and to afford Optionee the opportunity to acquire, or enlarge, Optionee's stock ownership of the Company's Common Stock, par value $.01 per share (the "Stock"), so that Optionee may have a direct proprietary interest in the Company's success;

WHEREAS, all capitalized terms not otherwise defined herein shall have the same meaning as set forth in Company's 2005 Stock Incentive Plan (the "Plan").

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. **Grant of Option.** Subject to the terms and conditions set forth herein and in the Plan, the Company hereby grants to the Optionee, during the period commencing on the date of this Agreement and ending on the date that is seven years from the Effective Date (the "Option Period"), the right and option (the right to purchase any one share of Stock hereunder being an "Option") to purchase from the Company, at an exercise price of [$____] per share (the "Option Price"), an aggregate of [_____] shares of Stock. The Options are not intended to be "incentive stock options", as defined in Section 422 of the Internal Revenue Code of 1986, as amended.

2. **Exercise of Option**.

(a) Subject to the terms and conditions set forth herein and provided the Optionee's employment continues, the Options shall vest and become exercisable in accordance with the following schedule:

(i) one-fourth of the Options shall vest and become exercisable on the one-year anniversary of the Effective Date;

(ii) an additional one-fourth of the Options shall vest and become exercisable on the two-year anniversary of the Effective Date;

(iii)  an additional one-fourth of the Options shall vest and become exercisable on the three-year anniversary of the Effective Date; and

(iv)  the remainder of the Options shall vest and become exercisable on the four-year anniversary of the Effective Date (each such anniversary date shall hereafter be referred to as a "Vesting Date" and the period between the date hereof and the first Vesting Date and the subsequent periods between Vesting Dates shall hereafter be referred to as "Vesting Periods").

(b)  The Options shall vest only as to full shares of Stock rounded down to the nearest full share during the first three vesting dates and all fractions shall be amalgamated and become exercisable on the last vesting date.  Except as otherwise stated in this Agreement, the Options shall expire on the seven-year anniversary of the Effective Date.

3.  **Termination of Employment**.

(a)  If the Optionee's employment with the Company and all Affiliates is terminated for Cause, all Options (whether vested or not) shall immediately expire.

(b)  If the Optionee resigns from employment with the Company and all Affiliates other than for "Good Reason," all unvested Options shall expire and all vested Options shall remain exercisable for the shorter of (i) three months following the date of termination or (ii) the remainder of the Option Period.

(c)  If the Optionee's employment with the Company and all Affiliates is terminated by the Company or an Affiliate other than for Cause or the Optionee resigns for "Good Reason" during the time that the Optionee's employment with the Company is subject to an employment agreement between the Optionee and the Company and such employment agreement so provides, all unvested Options shall vest immediately.  If the Optionee's employment with the Company and all Affiliates is terminated by the Company or an Affiliate other than for Cause or the Optionee resigns for "Good Reason" during the time that the Optionee's employment with the Company is no longer subject to an employment agreement between the Optionee and the Company and such employment is on an "at-will" basis, the unvested Options that are scheduled to vest on the next Vesting Date immediately following such termination date shall vest on a pro rata basis where the number of shares of Stock subject to pro rata vesting is equal to the number of shares subject to vesting on such Vesting Date multiplied by a fraction, the numerator of which shall be equal to the number of days the Optionee was employed during the applicable Vesting Period and the denominator of which shall be equal to 365 and all other unvested Options remaining at the time of such termination after application of such pro rata vesting shall expire.  In the event that the Optionee's employment with the Company and all Affiliates is terminated by the Company or an Affiliate other than for Cause or the Optionee resigns for "Good Reason" (regardless of whether the Optionee's employment is then subject to an employment agreement), all vested Options (including those that vest upon such termination) shall remain exercisable for the shorter of (i) the Post Termination Exercise Period (as defined below) or (ii) the remainder of the Option Period.  The Post Termination Exercise Period shall mean (x) the period that is two years following the date of termination, if the termination occurs prior to the third anniversary of the Grant Date, (y) the period that is one

year following the date of termination, if the termination occurs on or following the third anniversary of the Grant Date but prior to the fifth anniversary of the Grant Date, or (z) the period that is three months following the date of termination, if the termination occurs on or following the fifth anniversary of the Grant Date; provided, however, that if the Optionee's employment is terminated on account of death or Disability, the Post Termination Exercise Period shall not be shorter than one year following the date of the Optionee's termination of employment.

(d) If the Optionee's employment with the Company and all Affiliates terminates on account of the Optionee's death or Disability all unvested Options shall immediately expire and all vested Options will remain exercisable for the shorter of (i) the Post Termination Exercise Period or (ii) the Option Period.

(e) For purposes of clarification, neither a New FSS Sale Event nor a New SS/L Sale Event, shall in and of itself, be considered a termination of the Optionee's employment with the Company and all Affiliates without Cause or an event constituting "Good Reason."

### 4. **Method of Exercising Option**.

(a) Options which have become exercisable may be exercised by delivery of written notice of exercise to the Committee accompanied by payment of the Option Price. Payment for shares of Stock acquired pursuant to Options shall be made in full, upon exercise of the Options in immediately available funds in United States dollars, by certified or bank cashier's check or, in the discretion of the Committee, (i) by surrender to the Company of Mature Shares held by the Participant; (ii) by delivering to the Committee a copy of irrevocable instructions to a stockbroker to deliver promptly to the Company an amount of sale or loan proceeds sufficient to pay the aggregate Option exercise price; (iii) through a net exercise of the Options whereby the Participant instructs the Company to withhold that number of shares of Stock having a fair market value equal to the aggregate exercise price of the Options being exercised and deliver to the Participant the remainder of the shares subject to exercise or (iv) by any other means approved by the Committee. For purposes of this paragraph, the term "Mature Shares" shall mean shares of Stock for which the Optionee has good title, free and clear of all liens and encumbrances, and which the Optionee either (i) has held for at least six months or (ii) has purchased on the open market.

(b) At the time of exercise, (i) the Company shall have the right to withhold from the number of shares of Stock to be issued upon exercise, the minimum number of shares necessary or (ii) at the discretion of the Committee, the Optionee shall be obligated to pay to the Company such amount as the Company deems necessary, in either event, to satisfy its obligation to withhold Federal, state or local income or other taxes incurred by reason of the exercise or the transfer of shares thereupon.

### 5. **Issuance of Shares.** As promptly as practical after receipt by the Company of a written notice of exercise and full payment to the Company of the exercise price and any required income tax withholding amount, the Company shall issue or transfer to the Optionee the number of shares of Stock with respect to which Options have been so exercised, or

the net number of shares of Stock in the event of an exercise pursuant to Section 4(a)(iii), or to the extent applicable in Section 4(a)(iv), or after application of Section 4(b), or both, and shall deliver to the Optionee (or the Optionee's estate or beneficiary, if applicable) a certificate or certificates therefor, registered in the name of the Optionee (or such estate or beneficiary).

6. **Non-Transferability.** The Options are not transferable by the Optionee otherwise than by will or the laws of descent and distribution and are exercisable during the Optionee's lifetime only by Optionee. No assignment or transfer of the Options, or of the rights represented thereby, whether voluntary or involuntary, by operation of law or otherwise (except by will or the laws of descent and distribution), shall vest in the assignee or transferee any interest or right herein whatsoever, but immediately upon such assignment or transfer the Options shall terminate and become of no further effect.

7. **Rights as Stockholder.** Neither the Optionee nor a permitted transferee of the Options shall have any rights as a stockholder with respect to any share of Stock covered by the Options until the Optionee or any transferee shall have become the holder of record of such share, and no adjustment shall be made for dividends or distributions or other rights in respect of such share for which the record date is prior to the date upon which the Optionee or any transferee shall become the holder of record thereof.

8. **Compliance with Law.** Notwithstanding any of the provisions hereof, the Optionee hereby agrees that Optionee will not exercise the Options, and that the Company will not be obligated to issue or transfer any shares of Stock to the Optionee hereunder, if the exercise hereof or the issuance or transfer of such shares shall constitute a violation by the Optionee or the Company of any provisions of any law or regulation of any governmental authority. Any determination in this connection by the Committee shall be final, binding and conclusive. The Company shall in no event be obliged to register any securities pursuant to the Securities Act of 1933 (as now in effect or as hereafter amended) or to take any other affirmative action in order to cause the exercise of the Options or the issuance or transfer of shares of Stock pursuant thereto to comply with any law or regulation of any governmental authority.

9. **Notice.** Every notice or other communication relating to this Agreement shall be in writing, and shall be mailed to or delivered to the party for whom it is intended at such address as may from time to time be designated by it in a notice mailed or delivered to the other party as herein provided, provided that, unless and until some other address be so designated, all notices or communications by the Optionee to the Company shall be mailed or delivered to the Company at its principal executive office, and all notices or communications by the Company to the Optionee may be given to the Optionee personally or may be mailed to Optionee at the Optionee's last known address, as reflected in the Company's records.

10. **Binding Effect.** Subject to Section 7 hereof, this Agreement shall be binding upon the heirs, executors, administrators and successors of the parties hereto.

11. **Governing Law.** This Agreement shall be construed and interpreted in accordance with the laws of the state of Delaware, without regard to the principles of conflicts of law thereof.

12. **Plan.** The terms and provisions of the Plan are incorporated herein by reference. In the event of a conflict or inconsistency between discretionary terms and provisions of the Plan and the express provisions of this Agreement, this Agreement shall govern and control. In all other instances of conflicts or inconsistencies or omissions, the terms and provisions of the Plan shall govern and control.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LORAL SPACE & COMMUNICATIONS INC.

By: _____
Name:
Title:

Accepted:

_____
Optionee

_____
Address

_____

_____
Social Security Number

NON-QUALIFIED
STOCK OPTION AGREEMENT

UNDER

LORAL SPACE & COMMUNICATIONS INC.
2005 STOCK INCENTIVE PLAN

THIS AGREEMENT, made as of this [___] day of [_____], 2005 (the "Grant Date"), by and between Loral Space & Communications Inc., a Delaware corporation (the "Company"), and _____ (the "Optionee").

WHEREAS, the Optionee is employed by the Company or an Affiliate in a key capacity, and the Company desires to have Optionee remain in such employment and to afford Optionee the opportunity to acquire, or enlarge, Optionee's stock ownership of the Company's Common Stock, par value $.01 per share (the "Stock"), so that Optionee may have a direct proprietary interest in the Company's success;

WHEREAS, all capitalized terms not otherwise defined herein shall have the same meaning as set forth in Company's 2005 Stock Incentive Plan (the "Plan").

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. **Grant of Option.** Subject to the terms and conditions set forth herein and in the Plan, the Company hereby grants to the Optionee, during the period commencing on the date of this Agreement and ending on the date that is seven years from the Effective Date (the "Option Period"), the right and option (the right to purchase any one share of Stock hereunder being an "Option") to purchase from the Company, at an exercise price of [$____] per share (the "Option Price"), an aggregate of [_____] shares of Stock. The Options are not intended to be "incentive stock options", as defined in Section 422 of the Internal Revenue Code of 1986, as amended.

2. **Exercise of Option**.

(a) Subject to the terms and conditions set forth herein and provided the Optionee's employment continues, the Options shall vest and become exercisable in accordance with the following schedule:

(i) one-fourth of the Options shall vest and become exercisable on the one-year anniversary of the Effective Date;

(ii) an additional one-fourth of the Options shall vest and become exercisable on the two-year anniversary of the Effective Date;

(iii)  an additional one-fourth of the Options shall vest and become exercisable on the three-year anniversary of the Effective Date; and

(iv)  the remainder of the Options shall vest and become exercisable on the four-year anniversary of the Effective Date.

(b)  The Options shall vest only as to full shares of Stock rounded down to the nearest full share during the first three vesting dates and all fractions shall be amalgamated and become exercisable on the last vesting date.  Except as otherwise stated in this Agreement, the Options shall expire on the seven-year anniversary of the Effective Date hereof.

## 3. **Termination of Employment**.

(a)  If the Optionee's employment with the Company and all Affiliates is terminated for Cause, all Options (whether vested or not) shall immediately expire.

(b)  If the Optionee resigns from employment with the Company and all Affiliates other than for "Good Reason," all unvested Options shall expire and all vested Options shall remain exercisable for the shorter of (i) three months following the date of termination or (ii) the remainder of the Option Period.

(c)  If the Optionee's employment with the Company and all Affiliates is terminated by the Company or an Affiliate other than for Cause or the Optionee resigns for "Good Reason", all unvested Options shall vest immediately and all vested Options (including those that vest upon such termination) shall remain exercisable for the shorter of (i) the Post Termination Exercise Period (as defined below) or (ii) the remainder of the Option Period.  The Post Termination Exercise Period shall mean (x) the period that is two years following the date of termination, if the termination occurs prior to the third anniversary of the Grant Date, (y) the period that is one year following the date of termination, if the termination occurs on or following the third anniversary of the Grant Date but prior to the fifth anniversary of the Grant Date, or (z) the period that is three months following the date of termination, if the termination occurs on or following the fifth anniversary of the Grant Date; provided, however, that if the Optionee's employment is terminated on account of death or Disability, the Post Termination Exercise Period shall not be shorter than one year following the date of the Optionee's termination of employment.

(d)  If the Optionee's employment with the Company and all Affiliates terminates on account of the Optionee's death or Disability all unvested Options shall immediately expire and all vested Options will remain exercisable for the shorter of (i) the Post Termination Exercise Period or (ii) the Option Period.

(e)  For purposes of clarification, neither a New FSS Sale Event nor a New SS/L Sale Event, shall in and of itself, be considered a termination of the Optionee's employment with the Company and all Affiliates without Cause or an event constituting "Good Reason."

## 4. **Method of Exercising Option**.

(a) Options which have become exercisable may be exercised by delivery of written notice of exercise to the Committee accompanied by payment of the Option Price. Payment for shares of Stock acquired pursuant to Options shall be made in full, upon exercise of the Options in immediately available funds in United States dollars, by certified or bank cashier's check or, in the discretion of the Committee, (i) by surrender to the Company of Mature Shares held by the Participant; (ii) by delivering to the Committee a copy of irrevocable instructions to a stockbroker to deliver promptly to the Company an amount of sale or loan proceeds sufficient to pay the aggregate Option exercise price; (iii) through a net exercise of the Options whereby the Participant instructs the Company to withhold that number of shares of Stock having a fair market value equal to the aggregate exercise price of the Options being exercised and deliver to the Participant the remainder of the shares subject to exercise or (iv) by any other means approved by the Committee. For purposes of this paragraph, the term "Mature Shares" shall mean shares of Stock for which the Optionee has good title, free and clear of all liens and encumbrances, and which the Optionee either (i) has held for at least six months or (ii) has purchased on the open market.

(b) At the time of exercise, (i) the Company shall have the right to withhold from the number of shares of Stock to be issued upon exercise, the minimum number of shares necessary or (ii) at the discretion of the Committee, the Optionee shall be obligated to pay to the Company such amount as the Company deems necessary, in either event, to satisfy its obligation to withhold Federal, state or local income or other taxes incurred by reason of the exercise or the transfer of shares thereupon.

5. **Issuance of Shares.** As promptly as practical after receipt by the Company of a written notice of exercise and full payment to the Company of the exercise price and any required income tax withholding amount, the Company shall issue or transfer to the Optionee the number of shares of Stock with respect to which Options have been so exercised, or the net number of shares of Stock in the event of an exercise pursuant to Section 4(a)(iii), or to the extent applicable in Section 4(a)(iv), or after application of Section 4(b), or both, and shall deliver to the Optionee (or the Optionee's estate or beneficiary, if applicable) a certificate or certificates therefor, registered in the name of the Optionee (or such estate or beneficiary).

6. **Non-Transferability.** The Options are not transferable by the Optionee otherwise than by will or the laws of descent and distribution and are exercisable during the Optionee's lifetime only by Optionee. No assignment or transfer of the Options, or of the rights represented thereby, whether voluntary or involuntary, by operation of law or otherwise (except by will or the laws of descent and distribution), shall vest in the assignee or transferee any interest or right herein whatsoever, but immediately upon such assignment or transfer the Options shall terminate and become of no further effect.

7. **Rights as Stockholder.** Neither the Optionee nor a permitted transferee of the Options shall have any rights as a stockholder with respect to any share of Stock covered by the Options until the Optionee or any transferee shall have become the holder of record of such share, and no adjustment shall be made for dividends or distributions or other rights in respect of such share for which the record date is prior to the date upon which the Optionee or any transferee shall become the holder of record thereof.

8. **Compliance with Law.** Notwithstanding any of the provisions hereof, the Optionee hereby agrees that Optionee will not exercise the Options, and that the Company will not be obligated to issue or transfer any shares of Stock to the Optionee hereunder, if the exercise hereof or the issuance or transfer of such shares shall constitute a violation by the Optionee or the Company of any provisions of any law or regulation of any governmental authority. Any determination in this connection by the Committee shall be final, binding and conclusive. The Company shall in no event be obliged to register any securities pursuant to the Securities Act of 1933 (as now in effect or as hereafter amended) or to take any other affirmative action in order to cause the exercise of the Options or the issuance or transfer of shares of Stock pursuant thereto to comply with any law or regulation of any governmental authority.

9. **Notice.** Every notice or other communication relating to this Agreement shall be in writing, and shall be mailed to or delivered to the party for whom it is intended at such address as may from time to time be designated by it in a notice mailed or delivered to the other party as herein provided, provided that, unless and until some other address be so designated, all notices or communications by the Optionee to the Company shall be mailed or delivered to the Company at its principal executive office, and all notices or communications by the Company to the Optionee may be given to the Optionee personally or may be mailed to Optionee at the Optionee's last known address, as reflected in the Company's records.

10. **Binding Effect.** Subject to Section 7 hereof, this Agreement shall be binding upon the heirs, executors, administrators and successors of the parties hereto.

11. **Governing Law.** This Agreement shall be construed and interpreted in accordance with the laws of the state of Delaware, without regard to the principles of conflicts of law thereof.

12. **Plan.** The terms and provisions of the Plan are incorporated herein by reference. In the event of a conflict or inconsistency between discretionary terms and provisions of the Plan and the express provisions of this Agreement, this Agreement shall govern and control. In all other instances of conflicts or inconsistencies or omissions, the terms and provisions of the Plan shall govern and control.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LORAL SPACE & COMMUNICATIONS INC.

By: _____
Name:
Title:

Accepted:

_____
Optionee

_____
Address

_____

_____
Social Security Number

Exhibit B
Form of Release

## **GENERAL RELEASE**

This General Release Agreement (the "Agreement") is made by and between Loral Space & Communications Inc. ("Loral" or the "Company"), and _____ (the "Employee").

In consideration of the terms and conditions contained herein, the parties agree as follows:

1.     Employee waives and releases any and all potential claims, including but not limited to claims for any compensation, benefits or stock options, known or unknown, he has against the Company, related corporations, subsidiaries, and their officers, directors, employees or agents, relating to or arising out of his employment with the Company and his termination from the Company, except as otherwise specifically provided in this Agreement. This waiver and release applies to all claims relating to his employment, including, but not limited to, claims arising under any state law, any federal law, any contract, tort or statutory claims, claims arising under Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act of 1990 and the Fair Labor Standards Act. In addition, Employee waives any right to initiate any shareholders' derivative action with respect to the Company by reason of any act or omission prior to the date of execution of this Agreement; provided, however, Employee may participate as a member of a class in any shareholders' derivative class action initiated by any other person.

2.     The Employee does not waive or release any rights the Employee may have: (i) under his Employment Agreement dated    2005 between the Company and Employee, as may be amended from time to time, or (ii) to indemnification or directors and officers liability insurance coverage, including, but not limited to, any rights under his Indemnification Agreement dated    , 2005 between the Company and Employee, as may be amended from time to time.

3.     The Employee does not waive or release any rights the Employee may have with respect to:

[list outstanding stock options]

4.     This waiver and release does not apply to any claim that the Employee may have for governmental unemployment benefits or workers' compensation benefits. This waiver and release does not apply to any claims not covered herein that arise after the date of execution of this Agreement.

5.     Employee acknowledges that he has been advised to consult an attorney before he signs this Agreement. Employee has 21 days within which to decide whether he will sign this Agreement, although Employee may sign the Agreement before the 21 days expire. Following his signature of the Agreement, Employee has seven days to revoke his signature. Any revocation must be in writing and personally delivered to _____ before expiration of the seventh day after Employee's signature of the Agreement.

6.     This Agreement is the total agreement of the parties with respect to the matters covered herein and replaces any prior negotiations or agreements between the parties whether oral or written. If any term, condition or section of this Agreement, except for paragraph 3, is determined to be invalid or unenforceable, such invalidity and unenforceability shall not affect the remaining terms, conditions or section hereof, which shall continue in full force and effect.

7.     This Agreement shall be governed and construed in accordance with the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of law. Employee hereby irrevocably submits himself to the exclusive jurisdiction of the courts of the State of New York and any federal courts located therein, for the purpose of any suit, action or other proceeding arising out of, or relating to, this Agreement or the subject matter hereof, and hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that he is not personally subject to the jurisdiction of the above-named courts for any reason whatsoever, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. In addition, Employee hereby irrevocably waives and agrees not to assert any right to trial by jury with regard to any suit, action or other proceeding arising out of, or relating to, this Agreement or the subject matter of this Agreement.

8.     Employee acknowledges that he has had the opportunity to discuss this Agreement with counsel, that he has read and understands this Agreement and signs it voluntarily.

Loral Space & Communications Inc.

Dated: _____     By:_____

Dated: _____     _____

Exhibit C
Indemnification Agreement